UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BARBARA SHEEHAN,

                Petitioner,

                               **REPORT AND**
                               **RECOMMENDATION**
      - against -                 14 CV 2898 (DLI) (CLP)

WILLIAM POWERS, Superintendent of
Albion Correctional Facility, and
THE ATTORNEY GENERAL OF THE
STATE OF NEW YORK,

                Respondents.
---------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

      On May 8, 2014, petitioner Barbara Sheehan filed this petition for a writ of habeas corpus,

pursuant to 28 U.S.C. § 2254, alleging that a New York trial court denied her the right to present

witnesses in her own defense by precluding the presentation of a vital expert witness, in violation

of her Sixth and Fourteenth Amendment rights.  (Pet.[1] at 4).  On April 12, 2017, the petition was

referred to the undersigned to prepare a Report and Recommendation.

      For the reasons set forth below, it is respectfully recommended that the petition be denied.


                FACTUAL AND PROCEDURAL BACKGROUND

      On February 18, 2008, petitioner Barbara Sheehan shot and killed her husband, Raymond

Sheehan, an ex-New York City police officer.  (Pet.'s Stmnt of Facts[2] at 1).  According to

---

    [1]Citations to "Pet." refer to the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody, filed on May 8, 2014.

    [2]Citations to "Pet.'s Stmnt of Facts" refer to petitioner's Statement of Facts, filed on May 8, 2014.

petitioner, she had been abused by her husband for many years.  (Pet., Ex. NN at 596–682).   On February 18, 2008, after years of abuse, Mr. Sheehan put a gun to petitioner's head and threatened to kill her if she did not make a phone call changing their travel plans.  (Id. at 677–82).  She claimed that she believed he was going to kill her, so she shot him with a revolver that she had retrieved.  (Id. at 687).  However, after she shot him and he was on the floor screaming and reaching for his gun, she grabbed his gun first and shot him in self-defense; she never intended to use a gun unlawfully.  (Id. at 688–692).

I.      Pretrial Proceedings

On May 12, 2008, petitioner was indicted on one charge of murder in the second degree and two charges of criminal possession of a weapon in the second degree (the "weapons charges").  (See Pet., Ex. B).[3]  One charge was based on petitioner's possession of the first gun, a revolver, and the other based on petitioner's possession of the second gun, a semiautomatic Glock pistol.  (Id.)  Petitioner was arraigned on June 4, 2008 and pleaded not guilty to each count.  (Pet.'s Stmnt of Facts at 4).

A.      Petitioner's Notice of Intent to Proffer Psychiatric Testimony

New York law requires a criminal defendant who plans on presenting psychiatric evidence at trial to serve on the prosecution and file with the court a "written notice of his intention to present psychiatric evidence."  N.Y. Crim. Proc. L. § 250.10(2).  The notice must be served and

_____

[3]Although the indictment does not indicate the date on which it was issued (see Pet., Ex. B), the parties agree that petitioner was indicted on May 12, 2008.  (See Pet.'s Stmnt of Facts at 1; Respondents' Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed on September 29, 2014 ("Resps.' Mem."), at 2).

filed "not more than thirty days after entry of the plea of not guilty to the indictment." Id.
However, a trial court, in the interests of justice and for good cause shown, may permit the notice
to be served and filed "any later time prior to the close of the evidence." Id.

On June 24, 2008, petitioner served and filed a "Notice Pursuant to CPL § 250.10" stating:
"Please take notice that the defendant Barbara Sheehan supplements her oral notice given at her
arraignment under section 250.10(c) of the Criminal Procedure Law to include evidence of Post
Traumatic Stress Disorder." (Pet., Ex. C). On October 27, 2008, petitioner served and filed a
"Supplemental Notice Pursuant to CPL § 250.10," providing that the psychiatric evidence sought to
be introduced would "include evidence of Post Traumatic Stress Disorder and Battered Woman's
Syndrome caused by chronic abuse." (Id., Ex. D). Specifically, petitioner intended to introduce the
testimony of Dr. Dawn Hughes ("Dr. Hughes"), a psychiatric expert who first examined petitioner
in March 2008. (Pet.'s Stmnt of Facts at 4).

On June 1, 2009, petitioner served on the prosecution and filed with the trial court a
supplemental "Notice Pursuant to CPL § 250.10(b)," stating that she was supplementing her
prior notices to include a notice of intent to present expert testimony regarding "a defense of
extreme emotional disturbance." (Pet., Ex. F). Specifically, "[t]he expert would be expected to
testify to the mental state of the defendant at the time of the offense." (Id.)


B.    Petitioner's July 28, 2009 Examination

New York Criminal Procedure Law provides that when a defendant has served a notice of
intent to present psychiatric testimony pursuant to Section 250.10 of the Criminal Procedure Law,
the prosecution may ask the trial court to order the defendant to submit to an examination by a
psychiatrist or psychological expert designated by the prosecution. N.Y. Crim. Proc. L. §

3

250.10(3).  Both the district attorney and the defendant's counsel have a right to be present at the examination, but "[t]he role of each counsel at such examination is that of an observer, and neither counsel shall be permitted to take an active role at the examination."  Id.

On July 23, 2009, the prosecution filed a motion seeking to set the conditions of petitioner's examination, which was scheduled for July 28, 2009.  (Pet., Ex. M at 2).  The prosecution claimed that petitioner's counsel would not consent to the examination proceeding pursuant to the Queens District Attorney's Office practice of conducting the examination in a room with a one-way mirror, with the district attorney and defense attorney watching and listening to the examination from outside the room.  (Id.)  Petitioner's counsel argued that petitioner's right to have an attorney present at the examination encompassed the right to sit next to or in the same room as petitioner.  (Id. at 3).   The prosecution requested that counsel be required to be in a separate room during the examination.  (Id.)  The trial court denied the prosecution's request.  (Id.)  However, the trial court ordered that "defense counsel refrain from communicating with defendant or discussing the interview with her during brief recesses that occur during the day of the interview(s)."  (Id. at 4).

Accordingly, on July 28, 2009, the prosecution's expert, Dr. Kathy Yates, commenced her examination of petitioner.  (See Pet., Exs. R-Z).  The examination proceeded for most of the day but was not completed.  (Id.)

During a hearing before the trial court two (2) days later, on July 30, 2009, the prosecution again sought an order requiring petitioner's counsel to observe the continued examination from a separate room, and instructing petitioner and her counsel not to confer during recesses in the examination.  (Id., Ex. N at 2).  The prosecution argued that petitioner's counsel was "dramatic and insidious in his interruptions" during the July 28, 2009 examination and had interfered with the examination in three ways.  (Id. at 3).  First, counsel "verbally interrupted the examination with

questions or comments during the course of the examination in the room," including in the middle of Dr. Yates' questions and before petitioner could answer.  (Id. at 3-4).  Second, Dr. Yates had arranged the room so that petitioner would be facing a one-way glass and a camera that would have captured petitioner's facial expressions, perspiration, and eye movements.  (Id. at 5).  Petitioner's counsel "interfered by repeatedly rearranging the room, the [petitioner's] positioning, the seating arrangement and arguing those arrangements with the psychologist."  (Id. at 4).  Third, petitioner's counsel "repeatedly compromised the examination by inciting the [petitioner] during recesses" and by acting "with extreme, unprovoked hostility and aggression in [petitioner's] presence" toward Dr. Yates, the Assistant District Attorney, and even toward the Court's law secretary, who was there to observe the proceedings.  (Id. at 6).  For example, after Dr. Yates asked counsel and petitioner not to confer during breaks, counsel "began to scream at Dr. Yates in [petitioner's] presence that [the prosecution was] trying to violate his [client's] Sixth Amendment right to counsel."  (Id. at 7).

In response, petitioner's counsel told the trial court that his client became distressed during the examination based on certain actions taken by the assistant district attorney.  (Id. at 13-14).  He further claimed that he had asked the room to be rearranged so that he would not be on camera, because "I thought that I should be an observer rather than someone on camera during the proceedings."  (Id. at 14).  Additionally, he claimed that his client "appeared to be physically ill and mentally stressed and emotionally distraught," causing him to raise the matter with Dr. Yates.  (Id.) Counsel stated that he did not discuss the examination with his client during breaks in the examination, but rather that he asked her how she was feeling because he was concerned about her well-being.  (Id. at 15).  Petitioner's counsel further noted that the trial court had instructed the parties that, if there was a problem during the examination, the parties should notify the court during the examination, but that the prosecution did not raise any objections to the court.  (Id. at

5

29).

After hearing the parties' arguments, the trial court issued the following ruling from the bench:

> [I]t has come to the Court's attention that defense counsel, in fact, spoke out during the examination on at least one occasion demanding that the psychologist ask defendant questions about how she was feeling and engaged in behavior that served to disrupt the flow of the examination and resulted in defendant becoming emotionally upset and hostile and ultimately caused the stoppage of the session. It should be noted that a representative of the Court was present and made observations during part of the examination. Under the circumstances, the Court is satisfied that defense counsel's presence in the same room with defendant during the examination interferes with and compromises the examination.

(Id. at 37-38).

The Court then ordered that defendant's psychiatric examination should continue, but that only the defendant and Dr. Yates would be present in the interview room during the examination and testing. (Id.) The Court further ordered that counsel for both sides were to observe the examination from an adjacent room, and that if the examination was recorded, a copy of the recording would be made available to both sides prior to trial. (Id.) Finally, defense counsel was ordered not to communicate with the defendant or discuss the interview with her during the brief recesses taken on the days of the examination. (Id.) The Court held that this arrangement would not interfere with the rights of the parties, and hopefully would avoid further delay and disruption. (Id.)

Following the court's order, the parties scheduled the continuation of the examination to occur on September 18, 2011. (Id. at 42-44). However, petitioner's counsel raised the concern that he might have to appear for trial in another case in Suffolk County on that date. (Id. at 40). Thus,

the trial court agreed to contact the judge in counsel's other case to confirm that there would be no conflict between the September 18, 2009 examination and counsel's trial, explaining that the court would be in contact with the parties regarding that date.  (Id. at 43-45).

On that same date, July 30, 2009, the trial court issued a written decision and order reflecting the rulings made on the record, except that instead of listing September 18, 2009 as the date of the continued examination, the order directed the parties to agree upon a date for the completion of the examination.  (See id., Ex. M at 4).  On the next day, July 31, 2009, the trial court sent a letter to the parties explaining that the judge had communicated with the judge presiding over petitioner's counsel's trial in Suffolk County, who assured the trial court that "that matter will not conflict with the continuation of defendant's examination on September 18th."  (Id., Ex. AA).  The trial court's letter confirmed that "both parties are expected to proceed with defendant's continued psychiatric examination on September 18, 2009."[4]  (Id.)

C.     Petitioner's Application for a Writ of Prohibition and the September Examination

On September 4, 2009, petitioner filed an Article 78 petition[5] for a writ of prohibition to prevent enforcement of the trial court's Order setting the conditions of the continued examination and questioning the speed with which the trial court had rendered its written decision.  Specifically, petitioner alleged that "there appeared to have been an ex parte communication between the prosecution and the trial court; no other explanation was apparent as to how the trial court could

---

[4]On July 31, 2009, petitioner claims that she completed three (3) additional hours of examination by Dr. Yates and planned to resume the examination on September 18, 2009. (Pet.'s Stmnt of Facts at 9–10).  This does not appear to be reflected in the record before this Court.

[5]Civil Practice Law and Rules (CPLR) Article 78 is the main procedural vehicle to challenge a New York-based government, agency, or administrative action.

produce a pre-prepared Decision and Order reflecting allegations yet to be made and containing relief yet to be sought." (Pet.'s Stmnt of Facts at 7).

On September 10, 2009, petitioner's counsel sent a letter to the district attorney indicating that he had been informed that a decision on his Article 78 petition was expected to be issued prior to September 18, 2009, the scheduled date of the examination. (Pet., Ex. BB at 1). Nevertheless, counsel indicated that if the prosecution was concerned about having to compensate Dr. Yates for her time in the event that no decision was issued and the examination did not proceed, petitioner would consent to adjourn the examination to another date. (Id.)

On September 15, 2009, the prosecution responded to petitioner's letter, indicating that whether or not a decision on the Article 78 petition was rendered prior to September 18, 2009, the Appellate Division had denied petitioner's application for a stay of proceedings, including a request to stay the September 18, 2009 examination. (Id., Ex. CC at 2). Accordingly, the prosecution declined to adjourn the examination and indicated its intent to proceed with the examination as scheduled on September 18, 2009. (Id. at 2–3). The prosecution's letter further noted that petitioner's "Article 78 motion was filed more than five weeks after the court's July 30, 2009 Order challenged therein, but was made returnable only four days prior to that scheduled examination." (Id.)

Petitioner did not appear for her examination on September 18, 2009, relying on the advice of her counsel. (Pet.'s Stmnt of Facts at 10). According to petitioner, she did not appear because no decision as to petitioner's motion for a writ of prohibition had been issued prior to September 18, 2009. (Id.)[6]

_____

[6]On October 20, 2009, the Appellate Division, Second Department, denied the petition for a writ of prohibition. (See Pet., Ex. O).

8

D.    The Motion to Preclude Dr. Hughes' Testimony

During a September 23, 2009 hearing with the trial court, the prosecution requested permission to seek relief under Section 250.10(5) of New York's Criminal Procedure Law due to petitioner's failure to appear at the September 18 examination.[7]  (Pet., Ex. DD at 3).  Specifically, Section 250.10(5) provides that when a court finds that a defendant "willfully refused to cooperate fully" in the examination by the prosecution's designated psychiatrist or psychologist, the court may "preclude introduction of testimony by a psychiatrist or psychologist concerning mental disease or defect of the defendant at trial."  N.Y. Crim. Proc. L. § 250.10(5).  Although the prosecution indicated that it would make a formal motion in writing, the parties orally discussed the circumstances of the missed examination on the record.  (See Pet., Ex. DD at 7–24).

Petitioner opposed the request, arguing that there had been no order requiring her to appear for the examination on September 18, 2009.  (Id.)[8]  Rather, petitioner claimed that she interpreted the trial court's July 30, 2009 written order as directing the parties to meet and confer regarding a date for the continuation of the examination.  (Id. at 7–10).  Petitioner's counsel claimed that there was "at best a miscommunication between the parties. . . . [O]bviously the prosecution is absolutely still entitled to continue the evaluation of my client, [and] she is ready, willing and able to proceed with that."  (Id. at 12).

On September 30, 2009, the prosecution filed a written motion seeking an order:  1) striking petitioner's Section 250.10 notice and precluding Dr. Hughes' testimony based on petitioner's

---

[7]At the same hearing, petitioner sought recusal of the trial judge, which was denied. (Pet., Ex. DD at 3).

[8]Petitioner also claimed that, contrary to the prosecution's statement, the Appellate Division had not denied a stay for proceedings; instead, according to petitioner, no such stay was ever sought.  (Id.)

"willful and persistent refusal to cooperate fully in the Court ordered examination by the People's psychologist" pursuant to Section 250.10(5) of the Criminal Procedure Law; 2) awarding costs for the prosecution's expenses related to the September 18, 2009 missed examination; and 3) sanctioning petitioner's counsel "in the sum of at least treble the amount of the ordered remuneration, not to be passed on to his client, for his willful and persistent disregard of the Court's orders." (Id., Ex. EE at 1).

On October 19, 2009, petitioner opposed the motion, arguing that the September 18, 2009 examination was never ordered by the trial court pursuant to Section 250.10(3) of the Criminal Procedure Law, and that even if there was such an order, petitioner did not willfully refuse to appear. (See id., Ex. FF). Petitioner further argued that even if preclusion was permitted under Section 250.10(5), the preclusion would violate petitioner's constitutional rights under the Compulsory Process Clause of the Sixth Amendment. (Id.)

E.     The Trial Court's Preclusion Order

On November 10, 2009, the trial court granted the prosecution's motion to preclude Dr. Hughes' testimony. (See id., Ex. A). With respect to the July 28, 2009 examination, the trial court explained that although petitioner's counsel had been permitted to be in the room with petitioner during the examination over the prosecution's objection, counsel was told to be a "'statue' and not interfere in any way." (Id. at 8). The trial court further commented that, at the July 30, 2009 hearing, counsel admitted that he requested a different seating arrangement and that he spoke out during the examination. (Id. at 9). The trial court noted that the court's law secretary was present during a portion of the examination and "observed defense counsel interrupt the interview, demand

that the psychologist ask defendant certain questions, prompt a recess in the interview, and yell at and argue with the assistant district attorneys and herself, all of which incited an emotional breakdown from defendant." (Id. at 3). The trial court explained that after the law secretary described her observations, the court prepared an order to be issued in the event that it was determined to be appropriate after the hearing, "anticipating that the People would seek" an order setting conditions for the continued examination, as the prosecution had previously sought a week earlier on July 23, 2009. (Id.)

Furthermore, the trial court noted that the parties had agreed on the record on July 30, 2009 that if petitioner's counsel's potential trial conflict was resolved, they would proceed with the examination on September 18, 2009. (Id. at 4). The court's July 31, 2009 letter clearly informed the parties "that there would be no conflict" and explicitly "confirmed the September 18, 2009 date of defendant's continued examination." (Id.) The trial court then held that the July 30, 2009 on-the-record agreement to proceed with the September 18, 2009 examination, confirmed by the court's July 31, 2009 letter, constituted an order under Section 250.10(3) directing petitioner to submit to the continued examination under the conditions specified on the record and in the trial court's written order. (Id.) The trial court explained:

> The plain language of the July 30, 2009 order directs defendant and defense counsel to continue the examination on a date agreed upon by the parties. The minutes of the July 30, 2009 calendar call reflects that the parties agreed on the record that the examination would proceed on September 18, 2009, and the Court's letter of July 31, 2009 confirmed the date. Defense counsel's claim that he did not believe that this was an order is simply not credible and is rejected.

(Id. at 9–10).

The trial court further noted that petitioner had failed to respond to the prosecution's

September 15, 2009 letter indicating that the prosecution intended to proceed with the September

18, 2009 examination.  (Id. at 5).  Petitioner's counsel did not inform the district attorney or Dr.

Yates that petitioner would not appear, nor was there a request made to the trial court to reschedule

the examination pending a ruling on the Article 78 petition.  (Id.)  Accordingly, the trial court found

that petitioner had willfully refused to cooperate in the prosecution's psychiatric examination.  (Id.

at 5–8).

     The trial court explained that the "prosecutor's right to examine the defendant

independently where the defendant has raised an issue of mental competence is grounded in

principles of fairness and is essential to preserving the integrity of the fact-finding process."  (Id. at

6 (citing People v. Berk, 88 N.Y.2d 257, 264–65, 667 N.E.2d 308, 312, 644 N.Y.S.2d 658, 662

(1996); People v. Segal, 54 N.Y.2d 58, 65, 429 N.E.2d 107, 110, 444 N.Y.S.2d 588, 590 (1981))).

The trial court further noted that the requirement that a defendant provide notice of intent to offer

psychiatric testimony within thirty (30) days of pleading not guilty "enables the People to have

defendant examined by their own experts within close temporal proximity to the offense and to any

examination by the defense experts, thereby preventing disadvantage to the prosecution in accord

with the legislative goal."  (Id. at 6–7 (quoting People v. Berk, 88 N.Y.2d at 265, 667 N.E.2d at

312, 644 N.Y.S.2d at 662)).

     Recognizing that preclusion "is a very serious and drastic remedy for a violation of CPL

250.10(3)," the trial court nevertheless found the remedy to be warranted.  (Id. at 10).  The court

found that petitioner had engaged in "a deliberate strategy of delay that has served to deprive the

People of the opportunity to have their own expert examine defendant within a reasonable time

after the crime and after timely service of notice pursuant to CPL 250.10."  (Id.)  Specifically, the

trial court noted that:  1) petitioner's initial 250.10 notice, dated June 24, 2008, was untimely and

did not mention or explain Post-Traumatic Stress Disorder or Battered Woman's Syndrome as a defense to the case; 2) the supplemental notice filed on October 27, 2008 further failed to sufficiently specify the nature of the anticipated defenses and their relationship to the proposed psychiatric testimony; 3) petitioner refused to disclose the name, <u>curriculum</u> <u>vitae</u>, and notes or reports of her own expert;[9] 4) on January 14, 2009, instead of complying with the trial court's order to produce such information, petitioner threatened to file an Article 78 petition; and 5) while petitioner did not initiate an Article 78 proceeding, she failed to produce the required information until several months later.  (<u>Id.</u> at 11–12).

The court then found that petitioner's counsel "thwart[ed] the expeditious prosecution of this case and has resulted in extraordinary delay."  (<u>Id.</u> at 13).  For example, the trial court explained that "[t]he fact that defense counsel instituted a baseless Article 78 proceeding accusing the Court of impropriety with respect to the July 30, 2009 order, knowing that the Court's representative had been present and observed the events . . . demonstrates the lengths to which he has gone to delay the matter."  (<u>Id.</u>)  The court concluded that "counsel made a strategic choice to disregard this Court's order to continue the examination on September 18, 2009, rather than apply to the Court for permission to reschedule it," demonstrating a "willful disregard[]" for the scheduled examination.  (<u>Id.</u> at 14).

With respect to petitioner's contention that preclusion would violate her Sixth Amendment rights, the trial court noted that the right to present witnesses and evidence is not absolute and

---

[9]In response to the trial court's order of December 17, 2008 requiring petitioner to produce certain discovery related to Dr.  Hughes' examination of petitioner, petitioner objected, first threatening to file an Article 78 proceeding, and eventually agreeing to produce certain records but seeking a protective order as to others.  The court denied the motion on April 27, 2009.

found that "[i]n balancing defendant's right to present witnesses in support of her defense and the People's right to have an examination conducted by their own expert, there is no question that the People have been severely prejudiced by defendant's unwarranted delay and failure to comply with the Court's orders."  (Id.)  The court explained that because it had been over one year and nine months since Mr. Sheehan's death, petitioner had prevented the prosecution from conducting their examination "within a reasonable period of time after the homicide under circumstances where her state of mind at the time of the crime is in issue."  (Id.)  Accordingly, the court held that "[d]efense counsel's purposeful delay and gamesmanship concerning discovery have contravened the requirements of CPL 250.10 and have severely undermined its purposes of promoting fairness, integrity in the fact-finding process and avoiding undue delay."  (Id.)

In light of these findings, the court granted the prosecution's motion to preclude Dr. Hughes' testimony.  (Id. at 14–15).  The court further ordered defense counsel to reimburse the Queens County District Attorney's Office for fees and costs incurred in connection with the September 18, 2009 examination for which petitioner failed to appear, but denied the request for punitive sanctions.  (Id. at 15–16).

F.    Appeal of the Preclusion Order

On March 10, 2010, petitioner filed an Article 78 petition seeking a writ of prohibition as to the preclusion order.  (Pet.'s Stmnt of Facts at 11).  On August 17, 2010, the Appellate Division, Second Department, denied the petition, finding that the trial court acted within its discretion and that petitioner could appeal the preclusion order following conviction.  (Pet., Ex. GG at 2 (citing N.Y. Crim. Proc. L. § 250.10(5)).  On January 6, 2011, the Court of Appeals denied petitioner leave

to appeal the Appellate Division's ruling.  (Id., Ex. HH).

G.    Motion in Limine  –  Permission to Present Generic Expert Testimony

On September 1, 2011, the trial court granted petitioner's motion in limine to present expert testimony "in the general area of Battered Women's Syndrome," which the court defined as "domestic violence and the common experiences of a battered woman."  (Id., Ex. II at 1 n.1, 3). The trial court reiterated its ruling that petitioner was precluded "from offering testimony by a psychiatrist or psychologist who examined the defendant."  (Id. at 2).  However, because defendant planned to present a justification defense based on Battered Women's Syndrome, the court "determined that the trial jury may benefit from . . . general specialized knowledge" related to Battered Woman Syndrome, and "could apply it or disregard it during their fact finding process." (Id. (citation omitted)).

II.    Trial Proceedings

A.    Testimony

At trial, the prosecution presented the testimony of William Schulken, a UPS driver who arrived at petitioner's home on February 18, 2008, shortly after petitioner shot Mr. Sheehan.  (Pet., Ex. KK at 19–60).  He heard petitioner screaming "he's dead," and observed her with two (2) guns in her hands.  (Id. at 25).  He then called 911.  (Id. at 23–24).  Officer Michael Petrizzo testified that when he arrived, petitioner was sitting and crying and told him that "I shot him.  I shot him.  I think he's dead upstairs.  He's a retired cop.  He is in the bathroom."  (Id. at 72–73).  He also observed two guns: a revolver and a Glock.  (Id.)  The evidence showed that Mr. Sheehan had been shot five

15

times by the revolver and six times by the Glock. (Id., Ex. LL at 416, 423). The chief medical
examiner testified that, in her opinion, none of the gunshot wounds individually or collectively
would have caused Mr. Sheehan to die instantaneously; rather, she testified that Mr. Sheehan
would have been able to continue speaking after he was shot. (Id., Ex. MM at 519).

Petitioner testified on her own behalf. She testified as to her relationship with Mr. Sheehan,
including her long history of abuse beginning in 1989. (Id., Ex. NN at 596). According to
petitioner, Mr. Sheehan often became angry with her, verbally abused her, pushed and tripped her.
(Id. at 597–99). She testified that as the violence became more severe, sometimes he would push
her down, step on her, and choke her. (Id. at 600–01). She further alleged that he would spit in her
face and throw food both on her and on the floor if he did not like what she had cooked for him,
including boiling hot pasta sauce. (Id. at 601–02). Petitioner described one occasion in 1994 when
Mr. Sheehan hit her, causing her to become black and blue and breaking her eardrum. (Id. at 604,
611–12). If she threatened to call for help, he would hit her with the phone and say, "I am the cops,
and they are not going to believe you." (Id. at 620–22). He said he knew how to kill her and make
it look like an accident. (Id. at 623–24). Petitioner's children, Raymond Sheehan, Jr., and Jennifer
Joyce, as well as petitioner's friends, Ronald Ferrara, Betsy Torres, Tania Broschart, and
petitioner's former co-worker Valerie Levant, all offered testimony about Mr. Sheehan's abuse of
Ms. Sheehan. (See Pet. Ex. PP at 1242–43; QQ at 1517–18).

Petitioner testified that in the first two weeks of February 2008, she and Mr. Sheehan had
been arguing about an upcoming trip to Florida, scheduled for February 18, 2008. (Id., Ex. NN at
663–665). According to petitioner, Mr. Sheehan punched her in the nose, causing her to seek
medical attention at the hospital. Mr. Sheehan told her that if she "told anybody what actually

happened to [her] nose . . . he would leave the hospital, and he would take care of [her] children."
(Id. at 665–66).  She testified that she had seen Mr. Sheehan with a gun and a box of bullets.  (Id.)

According to petitioner, on the morning of February 18, 2008, Mr. Sheehan woke her up by dragging her out of bed and down the stairs; he then pushed her out the back door to her home, and told her she had to stay outside until she agreed to travel to Florida with him.  (Id. at 676–78).  Petitioner explained that she did not want to be alone with him in Florida because she was afraid that he would kill her there.  (Id. at 678-79).  She testified that it was raining outside that day and that Mr. Sheehan continued to scream at her, refusing to let her back in the house.  (Id.)  Eventually, she agreed to travel to Florida so that Mr. Sheehan would let her back in the house.  (Id.)

Petitioner testified that Mr. Sheehan pointed a gun at her head until she agreed to change their reservations to be alone in Fort Myers together.  (Id. at 680).  Immediately after she made the changes, Mr. Sheehan went to take a shower, warning her that if she left the house,  "he was going to kill [her] and he was going to kill [her] children."  (Id. at 682–84).  Fearing that he would harm her and her children, petitioner told Mr. Sheehan that she was going to get dog food in an attempt to escape the house.  (Id. at 684–85).  However, after telling Mr. Sheehan this, he opened the door to the bathroom, pointed a gun at petitioner's head, and said she could not leave or he was going to kill her.  (Id. at 685–86).  Petitioner testified that she "got really scared when [she] saw the gun" and that she "knew he was going to kill [her] right then."  (Id. at 686).

Subsequently, petitioner ran down the hallway to her bedroom to collect some money that she had been saving and the revolver; she claimed that she thought Mr. Sheehan might not shoot her if he saw her with a gun.  (Id. at 687).  She testified that as she walked down the hallway

towards the stairs, she approached the bathroom door, at which time Mr. Sheehan picked up his gun again, pointed it at her head, and said he was going to kill her.  (<u>Id.</u>)  Petitioner testified that she then shot the revolver.  (<u>Id.</u>)  She testified that she "wasn't even aiming. [She] couldn't aim."  (<u>Id.</u> at 688).

After petitioner shot Mr. Sheehan, he fell down between the toilet and the shower in the bathroom, but he was still sitting up and screaming at her.  (<u>Id.</u> at 689).  She testified that after realizing what had happened, she felt badly about what had occurred and started approaching Mr. Sheehan.  (<u>Id.</u> at 689–90).  However, she saw that Mr. Sheehan was reaching for the Glock, which he had been holding and which had fallen on the floor after petitioner shot him.  (<u>Id.</u> at 690).  He was screaming that he was going to kill her.  (<u>Id.</u>)  She testified that she was able to pick up the Glock before he did, but that he continued to scream that he was going to kill her.  (<u>Id.</u> at 691).  She believed that if Mr. Sheehan was able to stand up, he would have killed her.  (<u>Id.</u> at 691).  Petitioner then "shot the gun because [she] was afraid he was going to get up and he was going to kill [her]."  (<u>Id.</u> at 693).  She continued to shoot him until she "didn't feel threatened by him any longer."  (<u>Id.</u>)

At trial, Dr. Jacquelyn Campbell was called by the defense as an expert in domestic violence, testifying generally as to Battered Woman Syndrome.  (<u>See</u> <u>id.</u>, Ex. SS).  Dr. Campbell explained that, in her experience, abused women often develop symptoms of "low self-esteem, getting depressed and, importantly, in terms of learned helplessness, not being able to see a way out, thinking that anything they tried to do would be thwarted because it had been so many times before."  (<u>Id.</u> at 1369).  According to Dr. Campbell, as the violence continues and gets worse, the woman may become "more and more afraid oftentimes, and gets to the state where she's less able .

. . to see options." (Id.)  Notably, while Dr. Campbell testified generally as to Battered Woman

Syndrome, she did not testify that she had personally examined petitioner, nor did she testify as to

whether petitioner suffered from Battered Woman Syndrome.  (See id.)


      B.     <u>Closing Arguments and the Jury Charge</u>

At the end of the trial, petitioner's counsel argued that:

> What did [Mr. Sheehan's abuse] do to [petitioner]?  You can, I
> submit to you, evaluate this when coming – putting yourself kind
> of figuratively . . . in her place with what she knew about her
> husband when deciding whether what she did was reasonable; and
> Jennifer [petitioner's daughter] told of many, many acts of
> violence, of how [petitioner] would be backhanded across the face
> in the car if traffic was bad because she would be blamed for the
> traffic.  If Jennifer didn't perform well as a child gymnast at 13
> years old, [petitioner] would be hit and backhanded in the face
> because it was [petitioner's] fault that his daughter embarrassed
> him.
>
> You know, all of these things, all of these individual things go into
> the knowledge that [petitioner] had of her husband and how
> dangerous he was. . . . [I]t becomes something that is part of [her]
> knowledge of the dangerousness of that person that [she] is dealing
> with.

(Record[10], Ex. 15, at 55, 64–68).  Petitioner's counsel later continued:

> Where is there any evidence . . . that [petitioner] didn't have the
> gun pointed at her.  That [petitioner] wasn't told that she wasn't
> leaving the f'ing house, or that [petitioner] wasn't told that if you
> do I'll kill you. . . .
>
> You know she is terrified.  She runs down to the bedroom to get
> the stash of cash and puts it in her bra that she keeps in her
> underwear drawer.  She is terrified.  She said, "I knew he was
> going to kill me. . . ."

---

[10]Citations to "Record" refer to the State Court Record, filed on September 29, 2014 as
Docket Number 13.

(Id.)  Later, petitioner's counsel stated to the jury that, given the history of abuse suffered by petitioner, "[a]ll that history, formed that mental state when you act and everything that you know about a person," and asked "how can anyone say beyond a reasonable doubt . . . that she was not in reasonable fear of her life at that moment?"  (Id. at 75).  Petitioner's counsel concluded by arguing that the evidence presented to the jury "is all evidence, witnesses, that paints the picture that [petitioner] knew about . . . that all factored into her state of mind when she acted to save her life in self-defense."  (Id. at 88).

In the prosecution's closing, the assistant district attorney argued:

> Self-defense or a self-serving execution?  The justified taking of another human life or murder? . . . [E]ven if you were to accept every single solitary word of the [petitioner], there is no version of the facts that would permit the [petitioner] to take the life of an unarmed man.
>
> And, ladies and gentlemen, when you look at the version that the [petitioner] told you, under no version of the incident as she described it was she ever justified in using deadly physical force against her husband.

(Id. at 92–93).

After the parties presented their closing arguments, the trial court instructed the jury as to the elements of each charge.  (Pet., Ex. TT).  For the murder charge, the trial court instructed the jury as to a justification defense of self-defense:

> Under the law, a person may use deadly physical force upon another person when and to the extent that she reasonably believes it to be necessary to defend herself from what she reasonably believes to be the use or imminent use of deadly physical force by that other person against her.

(Id. at 16).

As to the weapons charges, the trial court gave the following instruction regarding

20

justification:

> The defense of justification does not apply to the crime of criminal possession of a weapon in the second degree because that defense applies only to the use of force which I explained to you in the murder charge.
>
> You may, however, in determining whether or not defendant had the intent required to commit this crime, remember it's possessing a loaded weapon with the intent to use unlawfully against another, you may, in determining whether or not the defendant had the intent required for the crime, consider the following:
>
> The use of a firearm to engage in conduct that is justifiable under the law is not unlawful. . . .

(Id. at 21–22).


#### C.    The Verdict

On October 6, 2011, petitioner was found not guilty of murder in the second degree, not guilty of criminal possession of a weapon in the second degree with respect to the revolver, and guilty of criminal possession of a weapon in the second degree with respect to the Glock.  (Id., Ex. WW at 15–16).  On November 10, 2011, petitioner was sentenced to five (5) years of incarceration and two-and-one-half (2.5) years of post-release supervision.  (Pet.'s Stmnt of Facts at 21 n.5).


#### D.    The Precluded Testimony

Petitioner contends that if permitted, Dr. Hughes, petitioner's psychiatric expert, would have testified as to petitioner's state of mind at the time of the shooting based on psychological

evaluations she performed of petitioner in March and April 2008. (Id., Ex. XX at 1).[11]  Dr. Hughes

also performed psychological tests and administered questionnaires to petitioner, interviewed

petitioner's children and one of petitioner's friends, and reviewed medical and legal documents and

records. (Id.)

First, Dr. Hughes would have testified that it was her professional opinion that petitioner

was a victim of intimate partner violence. (Id.)  According to Dr. Hughes, petitioner's claims of

domestic violence were "consistent with a pattern of severe, extensive, chronic and unremitting

intimate partner abuse," which included physical violence, psychological and sexual abuse, and

stalking that continued for decades. (Id.)  Specifically, petitioner had reported that Mr. Sheehan

engaged in "severe, repeated, and unremitting psychological abuse, violent assaults and terrorizing

acts that resulted in her feeling controlled, degraded, terrorized, and fearful of him." (Id.)  As a

result of Mr. Sheehan's "chronic and unrelenting violence and threats, his unfettered access to guns

and knives, and his position and connections with the NYPD," petitioner believed that he was

"truly capable of killing her." (Id. at 2).

Additionally, Dr. Hughes would have testified that petitioner "was exposed to serious

violence that has been statistically associated with lethality." (Id.)  According to Dr. Hughes, there

are a number of factors in domestic violence situations related to "femicide;" thus, "the more risk

factors you have, the greater the likelihood that you could end up being killed." (Id.)  In petitioner's

case, Dr. Hughes classified petitioner as being in "extreme danger," and found that petitioner's

perception "that her husband could and would eventually kill her was extraordinarily high." (Id.)

Accordingly, Dr. Hughes would have testified as to her opinion that petitioner "had a

_____

[11]On November 9, 2011, after the conclusion of trial, Dr. Hughes submitted a letter to the
trial court detailing the testimony she was prepared to provide regarding petitioner.

reasonable perception of fear and imminent danger of serious and lethal violence at the time she

shot Raymond Sheehan on February 18, 2008." (Id.)  Dr. Hughes would also have explained that

petitioner's perception was based on the historic abuse in the relationship, including chronic and

severe violence, abuse, threats to kill petitioner, her children, and her family, threats with weapons,

and "a sense of his psychological deterioration," which included specific life-threatening and

violent behaviors.  (Id.)

Dr. Hughes would have further testified that petitioner's perception of a threat was not

extinguished by petitioner's first shots fired at Mr. Sheehan with the revolver.  (Id.)  Dr. Hughes

was of the opinion that because Mr. Sheehan continued to scream threats at petitioner and reached

for the Glock even after the first shots were fired, petitioner believed that Mr. Sheehan could have

grabbed the Glock and used it to kill her.  (Id.)  Additionally, because "the psychological fear

response . . . does not turn off quickly," petitioner would have "remain[ed] in a constant state of

preparation" even after firing the first shots.  (Id. at 3)  Finally, because petitioner "had learned

through prior and repeated exposure to her husband's violence and abuse that he was the one who

stopped an abusive incident . . . [petitioner's] psychological state of mind was such on February 18,

2008 that Raymond Sheehan continued to be a valid and realistic threat even after being shot by the

first gun."  (Id.)[12]

_____

[12]Respondents warn that Dr. Hughes' proposed testimony contained the "potential to mislead jurors that the 'science' of Battered Woman's Syndrome is more reliable than it is" and contend that her proposed testimony was "little more than an expert's imprimatur that petitioner's testimony that she was afraid was truthful."  (Resps.' Mem. at 15).  The reliability of Dr. Hughes' methodology is not directly before this Court.  However, this Court notes that Dr. Hughes does not actually use the phrase "Battered Woman's Syndrome" once in her letter to the court, and instead relies on her own professional opinion as derived from empirically-validated screening tools.  See Lisa A. Goodman et al., Predicting Repeat Abuse Among Arrested Batterers: Use of the Danger Assessment Scale in the Criminal Justice System, 15 J. INTERPERSONAL VIOLENCE (finding that the Danger Assessment Scale, on which Ms. Sheehan

III. Post-Trial Proceedings

A. Direct Appellate Review

On April 26, 2012, petitioner appealed her conviction of the weapons count to the New York Appellate Division, Second Department. (See Pet., Ex. ZZ). Specifically, petitioner argued that: 1) her conviction was against the weight of the evidence (see id. at 28–45); 2) the trial court erred by precluding Dr. Hughes' testimony (see id. at 45–54); and 3) her sentence should be reduced as both a matter of law and of justice. (See id. at 54–60). In support of petitioner's appeal, a number of organizations and advocates submitted an amicus curiae brief arguing that "[i]n the absence of Dr. Hughes' proffered testimony, the jury lacked both the clarity and context necessary to fully understand Ms. Sheehan's conduct throughout the violent episode" that occurred on February 18, 2008. (Id., Ex. YY at 14). On August 9, 2012, the prosecution filed its response in opposition to petitioner's appeal (see id., Ex. AAA), and on September 4, 2012, petitioner filed her reply in support. (See id., Ex. BBB).

On May 29, 2013, the Appellate Division, Second Department affirmed the jury verdict and sentence imposed. (See id., Ex. CCC). Specifically, the Appellate Division found that the conviction on the weapons charge was not against the weight of the evidence, that "[t]he defendant's contention that the Supreme Court erred by precluding her from presenting expert psychiatric testimony with respect to her mental condition is academic in light of her acquittal of the count of murder in the second degree," and that the sentence imposed was not excessive. (Id. at 1–2). One judge filed a concurring opinion, contending that the sentence imposed should have

was classified as in "extreme danger," the highest classification, is "one of the few instruments with . . . any published empirical evaluation of psychometric properties such as test-retest and internal consistency reliability").

been reduced in the interests of justice.  (Id. at 2–3).

On June 5, 2013, petitioner sought leave to appeal to the New York Court of Appeals (see id., Ex. DDD), and on September 13, 2013, the Court of Appeals denied her application for leave to appeal.  (See id., Ex. EEE).

B.  Federal Habeas Petition

On May 8, 2014, petitioner filed the instant petition for a writ of habeas corpus.  (See Pet.). On September 29, 2014, respondents filed their opposition to the petition.  (See Resps.' Mem.).  On October 13, 2014, petitioner filed her reply in support of the petition.  (See Pet.'s Reply[13]).  On April 12, 2017, the Honorable Chief Judge Dora Irizarry referred the petition to the undersigned to prepare a Report and Recommendation.

On May 8, 2017, this Court directed the parties to file status letters addressing whether the petition might be moot since petitioner had completed her incarceratory sentence.

DISCUSSION

I.    Timeliness of Petition

This habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (codified as amended in scattered sections of the United States Code), which provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).  This limitation, absent certain exceptions that do not apply to this

---

[13]Citations to "Pet.'s Reply" refer to the Reply Memorandum of Law, filed on October 13, 2014.

case, runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). A conviction is deemed final for AEDPA purposes when the defendant's time to seek certiorari before the United States Supreme Court has expired. See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).[14] Moreover, any "time during which a properly filed application for State post-conviction or other collateral review . . . is pending" is excluded from the calculation of the statute of limitations period. 28 U.S.C. § 2244(d)(2).

Petitioner's direct appeal to the Appellate Division was denied on May 29, 2013 (see Pet., Ex. CCC), and petitioner's application for leave to appeal to the Court of Appeals was denied on September 13, 2013. (See id., Ex. EEE). Under Rule 13 of the Rules of the Supreme Court of the United States, petitioner's conviction became final 90 days after petitioner's motion for leave to appeal to the Court of Appeals was denied, on December 12, 2013.[15] Thus, the statute of limitations applicable to petitioner's habeas petition would have expired on December 12, 2014, one year after the period for petitioner to seek Supreme Court review expired. Petitioner filed her habeas petition on May 8, 2014, and therefore, her petition was timely filed before this Court.

II.    Mootness

A federal court may only consider a petition for a writ of habeas corpus under 28 U.S.C. § 2241 from prisoners "in custody in violation of the Constitution or laws or treaties of the United

---

[14]If the defendant files a petition with the United States Supreme Court, the conviction is final when certiorari proceedings have concluded. Williams v. Artuz, 237 F.3d at 151.

[15]A petition for a writ of certiorari is timely when filed within 90 days after entry of judgment of a state court of last resort or a United States court of appeals. Sup. Ct. R. 13. The petitioner did not seek such relief.

States." 28 U.S.C. § 2241(c)(3).  However, "actual, physical custody" is not required to satisfy the

"in custody" requirement.  Vega v. Schneiderman, 861 F.3d 72, 73 (2d Cir. 2017) (citing Jones v.

Cunningham, 371 U.S. 236, 239–40 (1963)).  Rather, a petitioner may satisfy this requirement if

"she is subject to a significant restraint upon her liberty 'not shared by the public generally.'"  Id.

(quoting Jones v. Cunningham, 371 U.S. at 240).  The focus is on "the 'severity' of an actual or

potential restraint on liberty."  Id. (quoting Poodry v. Towanda Band of Seneca Indians, 85 F.3d

874, 894–95 (2d Cir. 1996)).  A petitioner who is on parole or is serving a term of post-release

supervision satisfies the "in custody" requirement.  Lewis v. New York, No. 08 CV 4978, 2012 WL

5419899, at *2 (E.D.N.Y. Nov. 6, 2012) (citing Earley v. Murray, 451 F.3d 71, 75 (2d Cir. 2006));

see also Nowakowski v. New York, 835 F.3d 210, 216 (2d Cir. 2016) (identifying a number of

nonconfinement restraints on liberty that have been found to satisfy the "in custody" requirement,

including post-release supervision, community service, an unexpired suspended sentence, and

probation).

    On May 22, 2017, petitioner notified the Court that she had been released from prison on

March 2, 2017 but was continuing to serve a term of post-release supervision, which is scheduled to

terminate on September 3, 2019.[16]  (Pet.'s Ltr.[17] at 1).  She indicated that she had been suspended

without pay from her employment with the New York City Department of Education prior to trial,

and that suspension has continued pending the outcome of the instant petition.  (Id.)  According to

---

[16]According to the New York Department of Corrections and Community Supervision,
petitioner was released on parole on March 2, 2017, and her supervised release will terminate by
September 2, 2019.  See Sentence Terms and Release Dates, New York Dep't of Corrections and
Community Supervision, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last
accessed October 10, 2017).

[17]Citations to "Pet.'s Ltr." refer to petitioner's letter, filed on May 22, 2017.

petitioner, the Department of Education has taken the position that a failure to vacate her conviction will result in petitioner being terminated from her employment.  (Id.)  Thus, petitioner claims that her petition is not moot.  (Id.)  On June 16, 2017, respondents filed a response to petitioner's letter, agreeing with petitioner that her petition is not moot.  (Resps.' Ltr.[18] at 1–2.)

Since petitioner is serving a term of post-release supervision that is scheduled to end on September 2, 2019, petitioner remains "in custody" and her petition is not moot.  (Resps.' Ltr. at 1–2).  Accordingly, the Court finds that her petition is not moot and respectfully recommends that her petition be considered.

III.     Exhaustion of Petitioner's Claims

A.     Legal Standard

Before considering the merits of petitioner's claims, this Court must first determine if petitioner has exhausted all available state remedies and whether federal habeas review is permissible.

A petition for a writ of habeas corpus may not be granted unless all available state court remedies have been exhausted.  See 28 U.S.C. § 2254(b)(1)(A); Picard v. Connor, 404 U.S. 270, 275–76 (1971); Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010); Vittor v. New York State Dep't of Corr. and Cmty. Supervision, No. 13 CV 3112, 2014 WL 1922835, at *3 (E.D.N.Y. May 14, 2014).  To fulfill this requirement, "a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'"  Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994) (quoting Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir.

---

[18]Citations to "Resps.' Ltr." refer to respondents' letter, filed on June 16, 2017.

1990)), cert. denied, 514 U.S. 1054 (1995). The state court, therefore, must have had "a meaningful opportunity to consider [the] allegations of legal error." Vasquez v. Hillery, 474 U.S. 254, 257 (1986) (citations omitted).

The legal claims raised in the state courts must also be the "substantial equivalent" of the claims raised in the federal petition. See Picard v. Connor, 404 U.S. at 278; accord Jones v. Murphy, 694 F.3d 225, 247 (2d Cir. 2012); Waterhouse v. Rodriguez, 848 F.2d 375, 381 (2d Cir. 1988) (noting that "[t]he legal theory relied upon in the federal court need not . . . be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts"). Once a federal claim has been properly presented to the state courts, the claim is considered exhausted even if the state court did not address the claim on the merits and instead rejected it on a state procedural ground. See, e.g., Coleman v. Thompson, 501 U.S. 722, 731–32 (1991).

B.    Analysis

Petitioner contends that she properly exhausted her claim that the trial court unconstitutionally precluded Dr. Hughes's testimony. (Pet.'s Mem.[19] at 3). According to petitioner, this issue was addressed first in the trial court and also on direct appeal, when she argued before the Appellate Division that the preclusion of Dr. Hughes's testimony violated petitioner's "constitutional right to present witnesses in her defense." (Id. at 3–4 (citing Pet., Ex. ZZ)). Specifically, petitioner argued before the Appellate Division that the trial court "failed to consider whether the sanction of preclusion was disproportionate to the purposes it was designed to serve"

_____

[19]Citations to "Pet.'s Mem." refer to petitioner's Memorandum of Law, filed on May 8, 2014.

and "failed to inquire into whether alternative sanctions were adequate and appropriate." (Id. (citing Pet., Ex. ZZ)).  In response to the State's contention that petitioner's acquittal of murder rendered the question irrelevant because a justification defense does not apply under New York law to the weapons charge, petitioner responded that Dr. Hughes's testimony was nevertheless relevant to the issue of whether petitioner possessed the requisite unlawful intent.  (Id. at 4 (citing Pet., Exs. AAA, BBB)).

After the Appellate Division rejected petitioner's appeal, petitioner moved for leave to appeal to the Court of Appeals, "arguing that the Appellate Division's holding was in conflict with federal courts' understanding of the law of justification in New York." (Id. (citing Pet., Ex. DDD)). The Court of Appeals denied petitioner's motion for leave to appeal.  (Id. (citing Pet., Ex. EEE)). Thus, petitioner claims that she satisfied the exhaustion requirement.  Respondents do not contest petitioner's assertion that she properly exhausted her claims in state court, but rather contend that the petition should be denied on the merits.  (See Resps.' Mem. at 5).

Given that petitioner raised her claim that preclusion of Dr. Hughes' testimony violated her constitutional rights at the trial court level and on appeal to both the Appellate Division and Court of Appeals, the Court finds that petitioner properly exhausted her claims in state court.


IV.    Procedural Default

As a separate and distinct issue, the Court must also address whether there was a procedural default in the state proceedings.  See Engle v. Isaac, 456 U.S. 107, 136 (1982); Francis v. Henderson, 425 U.S. 536 (1976).  "A defendant whose claim is rejected in state court for failure to comply with a state procedural rule may be precluded from raising that claim on habeas review in federal court."  Petronio v. Walsh, 736 F. Supp. 2d 640, 652 (E.D.N.Y. 2010) (citing Coleman v.

Thompson, 501 U.S. at 729–30; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999)).  Thus, even if a petitioner raises a colorable federal claim, habeas review is barred if the claim was rejected in the state court on a procedural ground that is both "'independent' of the merits of the federal claim" and provides an "'adequate' basis for the court's decision."  Id. (quoting Fernandez v. Smith, 558 F. Supp. 2d 480, 489 (S.D.N.Y. 2008)).

Here, respondents do not claim that petitioner procedurally defaulted on her claims.  Indeed, the state courts resolved petitioner's claims on the merits, and the Court respectfully recommends a finding that petitioner did not procedurally default on her claims.


V.      The Merits of Petitioner's Claims

In her petition for habeas corpus, petitioner raises two arguments: 1) that the Appellate Division's determination that Dr. Hughes' testimony was properly precluded as irrelevant to the weapons charge violated petitioner's constitutional right to present evidence in support of a defense, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments and the Compulsory Process and Confrontation Clauses of the Sixth Amendment; and 2) that the preclusion of Dr. Hughes' testimony as a sanction under Criminal Procedure Law 250.10(5) was unconstitutional because the trial court failed to consider if the sanction was "arbitrary or disproportionate" to the purposes of the statute and whether there were alternative sanctions that would be adequate under the circumstances.


A.      Legal Standard

Under 28 U.S.C. § 2254, as amended by AEDPA, the authority of federal courts to grant writs of habeas corpus is limited to instances in which it can be shown that the adjudication of a

claim on the merits in state court (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[20]

"Clearly established federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." Brumfield v. Cain, 135 S. Ct. 2269, 2293 (2015) (quoting White v. Woodall, 134 S. Ct. 1698, 1702 (2014)); see also Jackson v. Conway, 763 F.3d 115, 134 (2d Cir. 2014) (quoting Rodriguez v. Miller, 537 F.3d 102, 106 (2d Cir. 2008)) (explaining that "no principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief"). Thus, "[w]hen there is no Supreme Court holding on a given issue, 'it cannot be said that the state court unreasonably applied clearly established Federal law' within the meaning of AEDPA." Smith v. Wenderlich, 826 F.3d 641, 649 (2d Cir. 2016) (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)).

Federal habeas courts must, in reviewing the application of Supreme Court holdings, consider their degree of specificity: "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Brumfield v. Cain, 135 S. Ct. at 2294 (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). Additionally, "if a habeas court must extend a

---

[20]Under 28 U.S.C. § 2254(d)(2), the authority of federal courts to grant habeas relief is limited to instances of a state court's factual determinations being "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Since there is no outstanding factual dispute in this case, this Court confines its discussion to section 2254(d)(1) only.

rationale before it can apply to the facts at hand," then by definition the rationale was not "clearly established at the time of the state-court decision." White v. Woodall, 134 S. Ct. at 1697, 1706 (citing Yarborough v. Albarado, 541 U.S. 652, 666 (2004)).

In Williams v. Taylor, 529 U.S. 362, 404–05 (2000), the Supreme Court explained that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings.  Id.  Under the "contrary to" prong, a state court decision is considered to be "contrary to . . . clearly established Federal law, as determined the Supreme Court" when "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." Carmichael v. Chappius, 848 F.3d 536, 544 (2d Cir. 2017) (quoting Williams v. Taylor, 529 U.S. at 412–13); accord Jackson v. Conway, 763 F.3d at 134; Evans v. Fischer, 712 F.3d 125, 132–33 (2d Cir. 2013).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if the state court "identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case," Smith v. Wenderlich, 826 F.3d at 649 (quoting Williams v. Taylor, 529 U.S. at 413), or "refuse[d] to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Georgison v. Donelli, 588 F.3d 145, 154 (2d Cir. 2009) (quoting Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006)).  In conducting this analysis, the appropriate inquiry is whether the decision was objectively unreasonable, not merely whether it was incorrect or erroneous.  Williams v. Taylor, 529 U.S. at 409–11.

B.      Scope of Review

Federal habeas review under Section 2254(d) is extremely narrow.  See Harrington v. Richter, 562 U.S. 86, 102 (2011).  As amended by AEDPA, Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Court's precedents."  Id.  Thus, the Court has stated that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal."  Id. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).  A habeas court must first determine the theories that formed the basis of the state court's decision, then ask whether "fairminded jurists could disagree" that those theories were inconsistent with a prior Supreme Court decision.  Id.  A habeas petitioner must show that the state court's ruling was "so lacking in justification" that there was an error in existing law that is "beyond any possibility for fairminded disagreement."  Id.  Thus, state court decisions must "be given the benefit of the doubt."  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)).


C.      Preclusion of the Expert's Testimony as Not Relevant to the Weapons Charge

Petitioner first argues that in upholding the preclusion of Dr. Hughes' testimony as irrelevant to the weapons charge, the Appellate Division violated clearly established federal law concerning a defendant's constitutional right to present relevant evidence as part of her defense. (Pet.'s Mem. at 7–14).


1. Clearly Established Federal Law - The Parties' Arguments

Petitioner acknowledges that the Appellate Division's determination that Dr. Hughes'

34

testimony was not relevant to petitioner's defense with respect to the weapons charges was an adjudication "on the merits," and thus is entitled to deference under AEDPA. (Pet.'s Mem. at 7). Petitioner also concedes that under state law, justification is not a defense to criminal possession of a weapon with intent to use it unlawfully. (Id. at 5–6). However, petitioner contends that the Appellate Division committed error in its reasoning that because the justification defense did not apply to the weapons charge under New York law, Dr. Hughes' testimony was therefore irrelevant to the jury's consideration of the intent element necessary to a conviction on the weapons charge. (Pet.'s Mem. at 8–10). Moreover, petitioner argues that this interpretation of state law was "contrary to clearly established federal law as determined by the Supreme Court." (Id. at 7).

Respondents contend that the New York Court of Appeals has "specifically rejected the claim that justification applies to the mens rea element of criminal possession of a weapon." (Resps.' Mem. at 13 (citing People v. Pons, 68 N.Y.2d 264, 50 N.E.2d 11, 508 N.Y.S.2 403 (1986) (affirming conviction for criminal possession of a weapon in the second degree, finding that the court had "properly refused to charge justification," and holding that "[j]ustification based on self-defense (Penal Law 35.15) pertains only to the use of physical force. . . . It does not apply to a crime based on the possession of a weapon, even though an element of the crime is that defendant possessed the weapon with the intent to use it unlawfully against another")). See also People v. Ramos, 193 Misc.2d 564, 567, 751 N.Y.S.2d 714 (Crim. Ct. Bronx Cty 2002) (holding that "justification is not a defense to a charge of weapons possession"); Wright v. Lee, No. 12 CV 6140, 2013 WL 1668266 (E.D.N.Y. April 17, 2013) (citing People v. Jenkins, 81 A.D.3d 662, 663, 918 N.Y.S.2d 114 (2d Dep't 2011) (holding that "the justification defense does not apply to the charge of criminal possession of a weapon in the second degree")).

Accordingly, respondents contend that since the Appellate Division's determination was

based on an interpretation of state law, this Court must accept the conclusion that Dr. Hughes' testimony was not relevant either to petitioner's <u>mens rea</u> or to a justification defense on the weapons count so long as that interpretation does not violate clearly established federal law. (Resps.' Mem. at 13).

### 2. The Relevance of Dr. Hughes' Testimony

Although justification is not a defense to a charge of criminal possession of a weapon in the second degree under New York law, the trial court, in charging the jury on the weapons charge, explained that the jury had to determine if the defendant had the requisite intent to commit the crime:

> The use of a firearm to engage in conduct that is justifiable under the law is not unlawful. Thus, an intent to use a firearm against another justifiably is not an intent to use it unlawfully. Therefore, to find defendant guilty of this crime, you must find beyond a reasonable doubt she possessed the firearm with the intent to use it against another unlawfully and not solely with the intent to use it justifiably.

(<u>Id.</u> at 9–10 (citing Pet., Ex. WW at 12)).

Petitioner claims that, in noticing her intent to offer psychiatric testimony, as required by New York Criminal Procedure Law Section 250.10(b), she made it clear that her expert "would be expected to testify to [her] mental state at the time of the offense." (<u>Id.</u> at 8 (citing Pet., Ex. F)). Specifically, Dr. Hughes was expected to opine that on February 18, 2008, in petitioner's mind, "Raymond Sheehan continued to be a valid and realistic threat even after being shot by the first gun." (<u>Id.</u> at 9 (citing Pet., Ex. XX at 3)). The doctor based this view of petitioner's continued perception of threat on the historical nature of the abusive relationship with incident-specific life-threatening and violent behaviors" and "nearly two decades of severe intimate partner violence."

(Id. at 8–9 (citing Pet., Ex. XX at 2)).  Petitioner argues that "without the benefit of Dr. Hughes' testimony, one might wrongly believe that Petitioner thought she had the upper hand and was out of danger" after the first shot.  (Id. at 11–12).  Thus, petitioner contends that Dr. Hughes' testimony was "directly and highly relevant to the jury's determination as to whether Petitioner possessed the Glock with the intent to use it unlawfully."  (Id. at 9).

Petitioner contends that New York courts have recognized that "Battered Woman's Syndrome is outside of the 'ken of the ordinary juror,'" and that Dr. Hughes' testimony could have created reasonable doubt on the issue of whether petitioner had the requisite intent to commit the weapons charge when she shot the Glock.  (Id. at 10–11 (citing People v. Seeley, 186 Misc.2d 715, 723, 720 N.Y.S.2d 315, 320–21 (N.Y. Sup. Ct. 2000)).  Thus, petitioner argues that "[t]he absence of this testimony was the difference between Petitioner's conviction and a full acquittal" (id. at 12), and that the preclusion of Dr. Hughes' testimony violated her right to present a complete defense, since it deprived her of the opportunity to present evidence relevant to the elements of the weapons possession charge for which she was convicted.  (Id.)

Despite petitioner's contention that Dr. Hughes' testimony was relevant to whether petitioner possessed the Glock with the necessary mens rea, as discussed supra, "federal courts must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional." Davis v. Strack, 270 F.3d 111, 123 n.4 (2d Cir. 2001) (citations omitted).  Accordingly, because the Appellate Division's finding that Dr. Hughes' testimony was not relevant to the weapons charge was based on an interpretation of state law, this Court is limited to determining whether the Appellate Division's interpretation of state law, as applied in this case, was contrary to or an unreasonable application of clearly established federal law, as provided by the Supreme Court.

37

### 3. Analysis

The Court's analysis is guided by the principle that there is "no absolute federal constitutional right to present psychiatric evidence on the question of <u>mens rea</u>." <u>Singh v. Greene</u>, No. 10 CV 4444, 2011 WL 2009309, at *19 (E.D.N.Y. May 20, 2011) (citing <u>Clark v. Arizona</u>, 548 U.S. 735, 770–71 (2006)).[21]  Indeed, although "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense . . . state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." <u>Goodwine v. Lee</u>, No. 10 CV 6019, 2016 WL 6840478, at *15 (S.D.N.Y. Feb. 10, 2016) (quoting <u>Nevada v. Jackson</u>, 133 S. Ct. 1990, 1992 (2013) (<u>per curiam</u>)), <u>report and recommendation adopted as modified</u>, 2016 WL 6834017 (S.D.N.Y. Nov. 17, 2016), <u>appeal filed</u>, No. 16-4127 (2d Cir. 2016).  Similarly, "the right to present relevant testimony is not without limitation." <u>Michigan</u>

---

[21]The parties argue about the applicability of <u>Clark v. Arizona</u> to the case at hand. In <u>Clark</u>, the Supreme Court upheld a state rule precluding the use of psychiatric evidence on the issue of <u>mens rea</u>, even if the evidence was relevant to the defense.  <u>Clark v. Arizona</u>, 548 U.S. at 770-71 (2006)).  Petitioner Clark, who shot and killed a police officer, sought to introduce evidence of mental illness both to support an affirmative defense of insanity and to argue that he did not have the required <u>mens rea</u> to commit murder.  (<u>Id.</u> at 743–44).  Based on an interpretation of an Arizona Supreme Court holding that "Arizona does not allow evidence of a defendant's mental disorder short of insanity . . . to negate the <u>mens rea</u> element of a crime," the Supreme Court upheld preclusion of the evidence, noting that,"the right to introduce relevant evidence can be curtailed if there is good reason for doing [so]." "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by . . . unfair prejudice, confusion of the issues, or potential to mislead the jury." (<u>Id.</u> at 770).  In the case at hand, petitioner distinguishes her case from <u>Clark</u> and notes that she did not claim that she lacked the mental capacity to possess the requisite <u>mens rea</u> for the weapons charge; rather, she asserts that relevant evidence was unconstitutionally precluded.  (Pet.'s Reply at 4, 9). However, respondents argue that the concern raised in <u>Clark</u>—namely, the expert's "potential to mislead jurors" as to the scientific reliability of her testimony—was present here as well. (Resps.' Mem. at 16–17). Respondents correctly note that the import of the holding in <u>Clark</u> is that a state may prevent a criminal defendant from introducing certain forms of evidence that a defendant claims are relevant on the issue of <u>mens rea</u>, making it clear that a defendant does not have an absolute right to present psychiatric evidence to negate the <u>mens rea</u> required to commit a crime.

v. Lucas, 500 U.S. 145, 149 (1991) (citations omitted).  Petitioner herself concedes that "the right to present relevant evidence is not absolute; it 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" (Pet.'s Mem. at 16) (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038 (1973))).

Other federal courts considering similar habeas claims have "accepted the Court of Appeals' holding that justification does not apply to second-degree weapons convictions" and concluded that such a finding does not constitute an unreasonable application of federal law. (Resps.' Mem. at 12, 14 (citing Davis v. Strack, 270 F. 3d at 134-35; Narcissi v. Mazzuca, No. 05 CV 5710, 2012 WL 1392359, at * 6-10 (E.D.N.Y. April 23, 2012); Cotton v. Superintendent, Wende Corr. Facility, No. 08 CV 453, 2010 WL 3516577, at *7 (W.D.N.Y. Sept. 3, 2010); McCarthy v. Phillips, No. 04 CV 3545, 2009 WL 3204660, at *11 (E.D.N.Y. Sept. 30, 2009); Brown v. Artus, No. 04 CV 3601, 2008 WL 9428119, at *11 (S.D.N.Y. Dec. 24, 2008), report and recommendation adopted, 2009 WL 1473428 (S.D.N.Y. May 27, 2009))).

### (a) Supreme Court Cases

In arguing that the Appellate Division's decision resulted in a violation of petitioner's constitutional rights, petitioner relies on four Supreme Court decisions which she argues provide clearly established law guaranteeing criminal defendants "a meaningful opportunity to present a complete defense" (see Pet.'s Mem at 7–8 (citing Crane v. Kentucky, 476 U.S. 683, 690 (1986); Strickland v. Washington, 466 U.S. 668, 684–85 (1984)), and the right to offer testimony and relevant evidence.  (See id. (citing Washington v. Texas, 388 U.S. 14, 19 (1967)); Taylor v. Illinois, 484 U.S. 400, 408 (1987))).   Petitioner argues that the Appellate Division's decision was contrary to these precedents.  (Id. at 8–10).

39

Respondents argue that none of these cases relates to the alleged right to present expert psychiatric testimony, and that petitioner has not identified any Supreme Court precedent directly holding that the right to present a defense extends to a right "to present psychiatric testimony either on a justification defense or <u>mens rea</u>." (Resps.' Mem. at 8). Respondents further object to what they view as petitioner's efforts to extend existing Supreme Court precedent to "mandate that a state court permit a defendant to call a witness solely to corroborate a defendant's statement as to her subjective state of mind," noting that "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably <u>applies</u> [the Supreme] Court's precedent; it does not require state courts to <u>extend</u> that precedent or license federal courts to treat the failure to do so as error." (<u>Id.</u> at 14-15 (emphasis in original) (quoting <u>White v. Woodall</u>, 134 S. Ct. at 1706)). Respondents note the Supreme Court's recent admonition that "AEDPA's carefully constructed framework would be undermined if <u>habeas</u> courts introduced rules not clearly established under the guise of extensions to existing law." (<u>Id.</u> at 10). Respondents maintain that petitioner has "frame[d] the Court's precedents at such a high level of generality that any extension of existing case law could be transformed into clearly established precedent." (<u>Id.</u> (quotations omitted)).

In <u>Crane v. Kentucky</u>, relied upon by petitioner, the Supreme Court held that, because criminal defendants are guaranteed "a meaningful opportunity to present a complete defense . . . the Kentucky courts erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession." 476 U.S. at 690–91. The Court explained that because the petitioner sought to argue that his confession should not have been believed based on the circumstances surrounding it, such evidence was relevant to the reliability and credibility of the confession, and the petitioner had the right to present evidence about those circumstances. <u>Id.</u> at 691. Here, on the other hand, the petitioner had the opportunity to explain

the circumstances of her shooting Mr. Sheehan.  She testified at length about the history of abuse

between the parties and the circumstances leading to the shooting the morning of February 18,

2008.  To corroborate this perspective, Ms. Sheehan had the opportunity to present generic

testimony about domestic violence, which the jury was free to credit or disregard as it saw fit.

Another case cited by petitioner, Washington v. Texas, examined whether the rights of the

defendant, who had been convicted on murder charges, had been violated when the trial court

precluded him from presenting the testimony of another participant in the alleged crime, based on a

state procedural law barring "persons charged as principals, accomplices, or accessories in the

same crime" from being introduced as witnesses for each other.  388 U.S. at 16–17 (footnote

omitted).  In reversing the defendant's conviction, the Supreme Court explained that "[t]he right to

offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to

present the defendant's version of the facts. . . ."  Id. at 19.  Although the Supreme Court in

Washington held that the petitioner had been denied his rights under the Compulsory Process

Clause, the holding of that case related to a fact witness who would testify as to his observations of

the crime in question.  It did not, however, address a defendant's right to present expert testimony

about the defendant's state of mind at the time of a crime that the expert did not witness.

In Taylor v. Illinois, the Supreme Court affirmed the defendant's conviction,

notwithstanding the exclusion of a witness who had not been disclosed to the prosecution prior to

trial, explaining that, although the exclusion of evidence as a sanction for the violation of a

discovery rule or order may violate the Compulsory Process Clause, such a sanction may also in

some cases be appropriate.  484 U.S. at 415–18.  Although the Court explained in broad terms that

"at a minimum . . . criminal defendants have . . . the right to put before a jury evidence that might

influence the determination of guilt," id. (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987)),

the Court did not consider whether a defendant has the right to present psychiatric or other expert testimony as a general matter.

As for Strickland v. Washington, petitioner accurately quotes a portion of the decision providing that "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." (Pet.'s Mem. at 7 (quoting Strickland v. Washington, 466 U.S. at 684–85)). However, Strickland dealt with a criminal defendant's right to receive effective assistance from his counsel, 466 U.S. at 698–700, and, thus, has no bearing on the specific issue presently before the Court as petitioner has not raised an ineffective assistance of counsel claim.

The Court finds that the preclusion of Dr. Hughes' testimony was not contrary to, or an unreasonable application of, the holdings of any of the Supreme Court cases cited by petitioner.  As respondents note, the cases to which petitioner cites generally recognize the right to present a defense, but, absent an extension of their principles, are insufficient to meet the stringent requirements of Section 2254(d)(1), discussed supra.  (Resps.' Mem. at 10.)

(b)  Circuit Precedent

Petitioner contends that "the circumstances of the instant case are "essentially no different" from those in Jackson v. Edwards, 296 F. Supp. 2d 292 (E.D.N.Y. 2003), aff'd, 404 F.3d 612 (2d Cir. 2005) (Pet.'s Mem. at 12), and argues that her conviction here was "no less fatally tainted by the unconstitutional preclusion of vital defense testimony." (Pet.'s Mem. at 14).

In Jackson, the defendant was convicted of manslaughter in the second degree and criminal possession of a weapon in the second degree, and acquitted of murder in the second degree, after the state trial court refused to charge the jury on the defense of justification in regards to any count.

42

Jackson v. Edwards, 296 F. Supp. 2d at 296, 300.  In granting a habeas petition as to the weapons charge, the district court explained that if the jury had found the defendant was justified in shooting the victim in self defense, the jury could have concluded that the petitioner's intended use of the weapon was "at all times lawful," and thus, the necessary element of intent would be lacking.  Id. at 303.  The Second Circuit affirmed, finding that the trial court's failure to give a justification instruction on any of the charges, including murder, "tainted . . . the jury's . . . evaluation of the weapons possession charge."  Jackson v. Edwards, 404 F.3d at 626.  The court explained that, although New York law does not provide a justification defense to a weapons possession charge, "if a properly instructed jury were to have concluded that [the petitioner] was not guilty of any homicide offense, then it might have also concluded that he lacked the requisite intent to be guilty of the weapons charge."  Id. at 626–27.  Accordingly, the Court held that "the trial court's failure to instruct the jury on the defense of justification with respect to the homicide count infected both of Jackson's convictions."  Id. at 627.

However, petitioner's references to Jackson v. Edwards do not suffice in meeting her habeas burden for three main reasons.  First, as discussed supra, Circuit Court decisions do not constitute clearly established Supreme Court precedent as required to grant a habeas petition. White v. Woodall, 134 S. Ct. at 1702.

Second, the decision in Jackson was issued prior to the Supreme Court's decisions in Harrington v. Richter and White v. Woodall, which "substantially heightened the requirements a petitioner must meet under [S]ection [2254(d)]."  (Id. at 11 (citing Harrington v. Richter, 131 S. Ct. at 786–87 (holding that to obtain a writ of habeas corpus, a state prisoner must show that the state court's ruling on a federal claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement"); <u>White v. Woodall</u>, 134 S. Ct. at 1706–07 (citation omitted) (explaining that state courts must reasonably apply the rules "squarely established" by the Supreme Court's holdings to the facts of each case)).

     Finally, the facts of <u>Jackson</u> are distinguishable from the case at hand.  Unlike in <u>Jackson</u>, where the trial court failed to give any justification instruction and Jackson was convicted of both homicide and weapons charges, <u>Jackson v. Edwards</u>, 404 F.3d at 628, here, the jury was given the justification instruction and acquitted petitioner of homicide. (Pet., Ex. TT at 16–20).  Moreover, while the trial judge instructed the jury that justification was not a defense to the weapons charge, the jury here was instructed that "an intent to use a firearm against another justifiably is not an intent to use it unlawfully" and that "to find the defendant guilty of this crime, you must find beyond a reasonable doubt that she possessed the firearm with the intent to use it against another unlawfully and not solely with the intent to use it justifiably."  (<u>Id.</u> at 22).

     Given that petitioner has been unable to identify a specific Supreme Court holding relating to a criminal defendant's right to present psychiatric testimony or other expert testimony on the question of <u>mens rea</u>, and "[w]here the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims," <u>White v. Woodall</u>, 134 S. Ct. at 1705, the Court finds that the exclusion of Dr. Hughes' testimony was not contrary to and did not involve an unreasonable application of clearly established federal law.

### (c)  <u>Conclusion</u>

     Accordingly, petitioner has failed to identify any clearly established federal law, as determined by the Supreme Court, that is contrary to the Appellate Division's decision, nor has she shown that the decision was an unreasonable application clearly established federal law.  The

holdings of the cases to which petitioner cited are either inapplicable to the facts of this case, or support the right to present a defense generally, but do not speak specifically to the matter of presenting psychiatric testimony about the defendant's subjective state of mind at the time the petitioner possessed the weapon.

In light of the foregoing, the Court respectfully recommends that the court find that petitioner has failed to establish that the Appellate Division's decision, affirming the trial court's preclusion of Dr. Hughes' testimony on relevance grounds, resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.

### D.    Preclusion of Petitioner's Expert as a Sanction

Petitioner raises a second claim that her constitutional rights were violated by the trial court's decision to preclude Dr. Hughes' testimony as a sanction for petitioner's failure to cooperate with the prosecution's expert's examination.  (See Pet.'s Mem. at 15).  Petitioner argues that in issuing its order pursuant to Section 250.10(5) of the New York Criminal Procedure Law, the trial court and then the Appellate Division violated clearly established federal law in failing to consider:  1) "whether preclusion was 'disproportionate' to the purposes that CPL 250.10(5) is designed to serve;" and 2) whether "'alternative sanctions' (which, according to the Supreme Court, should be 'adequate and appropriate in most cases')" were available.  (Id.)

### 1.  AEDPA Deference

As an initial matter, petitioner claims that the limited review standard set by 28 U.S.C. § 2254(d) is not applicable in the instant case because the Appellate Division did not address the

45

merits of her preclusion claim; thus, petitioner argues that the Court's review of that claim should be <u>de novo</u>. (Pet.'s Mem. at 15–16).

A federal <u>habeas</u> court must presume that the "last reasoned decision of the state court adjudicated all raised claims on the merits," and thus is entitled to deference under AEDPA. <u>Robinson v. Heath</u>, No. 11 CV 3489, 2014 WL 4954660, at *2 (E.D.N.Y. Oct. 2, 2014) (citing <u>Harrington v. Richter</u>, 562 U.S. at 99–100). "A judgment is normally said to have been rendered 'on the merits' only if it was 'delivered after the court . . . heard and <u>evaluated</u> the evidence and the parties' substantive arguments." <u>Johnson v. Williams</u>, 568 U.S. 289, 302 (2013) (emphasis in original) (quoting <u>On the Merits</u>, Black's Law Dictionary (9th ed. 2009)). "'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001). "[W]hen a state court rejects a federal claim without expressly addressing that claim, a federal <u>habeas</u> court must presume that the federal claim was adjudicated on the merits." <u>McCall v. Capra</u>, 102 F. Supp. 3d 427, 443 (E.D.N.Y. 2015) (quoting <u>Johnson v. Williams</u>, 568 U.S. at 301). However, "that presumption can in some limited circumstances be rebutted," <u>Johnson v. Williams</u>, 568 U.S. at 301, such as when "there is reason to think some other explanation for the state court's decision is more likely." <u>Harrington v. Richter</u>, 562 U.S. at 99–100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>see also</u> <u>Golb v. Attorney Gen. of the State of N.Y.</u>, No. 15 CV 1709, 2016 WL 297726, at *9 (S.D.N.Y. Jan. 1, 2016) (citing <u>Harrington v. Richter</u>, 562 U.S. at 99-100) (aff'd in part, rev'd in <u>part</u> by 870 F.2d 89 (2d Cir. 2017)

Where one state court reaches a "reasoned state judgment rejecting a federal claim," there is a presumption that later "unexplained orders upholding that judgment or rejecting the same claim

rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. at 803 (citing Coleman v. Thompson, 501 U.S. at 740); see also Rosario v. Ercole, 601 F.3d 118, 126 (2d Cir. 2010) (citing Ylst v. Nunnemaker, 501 U.S. at 803) (finding that "[b]ecause the state court [of] appeals did not address the ineffective assistance of counsel claim, we look to the trial court's analysis of the issue"); Serrano v. Fischer, 412 F.3d 292, 297 (2d Cir. 2005), cert. denied, 546 U.S. 1182 (2006). Thus, a federal habeas court applied Section 2254(d) deference to an evidentiary ruling made by the state trial court, where the appellate court did not address arguments made in the petitioner's habeas petition other than to say, "[t]he defendant's remaining contentions lack merit." Morales v. Smith, No. 05 CV 1104, 2005 WL 2367621, at *3–8 (E.D.N.Y. Sept. 27, 2005) (citations omitted).

### 2. The Parties' Arguments

Petitioner contends that unlike the decision on the relevance of Dr. Hughes' testimony to the weapons charge, the Appellate Division's decision rejecting petitioner's claim that the sanction of preclusion violated her constitutional rights was not a decision on the merits. (Pet.'s Mem. at 15–16). Rather, the Appellate Division found her claim to be "academic," given that petitioner had been acquitted of the murder charge and the justification defense was not applicable to the weapons charge. (Pet., Ex. CCC at 2). Accordingly, petitioner argues that the trial court's decision to preclude Dr. Hughes' testimony should not receive AEDPA deference, "because it wasn't reached by the Appellate Division [on the merits and], is subject to de novo review." (Pet.'s Mem. at 16).

Respondents argue that AEDPA deference nevertheless applies because when an issue is raised in state court but not addressed by the last reasoned decision, "the federal claim at issue is presumed to have been adjudicated on the merits by the state courts." (Resps.' Mem. at 6 (citing Johnson v. Williams, 568 U.S. at 293)). Here, because petitioner briefed this issue in her papers

47

submitted to the Appellate Division and the prosecution responded, respondents argue that the Appellate Division's decision was "delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments," and thus was on the merits.  (Id. at 6–7 (quoting Johnson v. Williams, 568 U.S. at 302); see also Pet., Exs. ZZ, AAA, BBB).  Alternatively, respondents argue that the Court should defer to the trial court's ruling on the issue because the last state court to rule on the question – the trial court – should be afforded deference for its decision.  (Resps.' Mem. at 7 (citing Ylst v. Nunnemaker,[22] 501 U.S. at 803; Hittson v. GDCP Warden, 759 F.3d 1210 (11th Cir. 2014); Amado v. Gonzalez, 758 F.3d 1119 (9th Cir. 2014); Winer v. Commissioner of Corr., No. 10 CV 743, 2012 WL 554451, at *7 (D. Conn. Feb. 17, 2012); Osoria v. Warden, No. 11 CV 637, 2011 WL 5910139, at *8 (D. Conn. Nov. 28, 2011))).

Petitioner argues in response that the Appellate Division's decision was not "without explanation" as to her preclusion claim, but rather, "the Appellate Division explicitly decided that it was not required to reach the claim because it was academic in light of Petitioner's acquittal for murder."  (Pet.'s Reply at 2).

3. Analysis

In this case, the Court finds that petitioner has not rebutted the presumption that "[w]hen a state court rejects a federal claim without expressly addressing that claim . . . the federal claim was adjudicated on the merits."  Johnson v. Williams, 568 U.S. at 301.  Here, the Appellate Division explained that petitioner's "contention that the [trial court] erred by precluding her from presenting

---

[22]Petitioner claims that Ylst v. Nunnemaker does not apply here because Ylst stands for the proposition that "later unexplained orders" upholding a lower court's judgment "rest upon the same ground" as the lower court's decision, and the Appellate Division's ruling was not an "unexplained order."  (Id. (citing Ylst v. Nunnemaker, 501 U.S. at 803)).

expert psychiatric testimony with respect to her mental condition" – in other words, her claim that the sanction imposed was unconstitutional – was "academic in light of her acquittal of the count of murder in the second degree." (Pet., Ex. CCC at 2 (citations omitted)). That is because the expert psychiatric testimony was only relevant to the justification defense to the homicide charge; since she was acquitted of the homicide charge, the question of whether the expert should have been allowed to testify was "academic."

Although petitioner is correct that the Appellate Division did not specifically render a decision as to whether the preclusion sanction violated her constitutional rights, the Appellate Division did hear and evaluate petitioner's evidence and arguments, see Johnson v. Williams, 568 U.S. at 302, and rendered a decision as to petitioner's appeal of the preclusion sanction. Specifically, the Appellate Division held that, because as a matter of state law, Dr. Hughes' proposed testimony was only relevant to the murder count on which petitioner was acquitted, whether the preclusion sanction was constitutional was an "academic" question. (Pet., Ex. CCC at 2). Thus, the Appellate Division denied petitioner's appeal of the preclusion sanction on the merits, based on the lack of relevance of Dr. Hughes' proposed testimony to the gun possession count on which petitioner was convicted, even though the Appellate Division did not specifically address the issue of the constitutionality of the sanction.

Accordingly, because the Appellate Division ruled on petitioner's appeal of the preclusion sanction on the merits and because federal courts must defer to state court interpretations of state law, see also supra at 37, the Court respectfully recommends that the Appellate Division's holding on petitioner's sanction claim be deferred to, and that the petition be denied as to this claim.

49

4.  Merits

Even if petitioner is correct and the Appellate Division did not rule on her preclusion claim on the merits, the Court respectfully recommends a finding that precluding Dr. Hughes' testimony as a sanction did not violate petitioner's constitutional rights.  Petitioner contends that the trial court violated her constitutional rights by:  1) failing to consider whether the sanction of preclusion was disproportionate to the purposes of Criminal Procedure Law Section 250.10(5); and 2) failing to consider less severe alternative sanctions.  (Pet.'s Mem. at 15, 20–24).  Respondents contend that the preclusion sanction did not violate petitioner's constitutional rights and instead was a legitimate exercise of the trial court's discretionary powers.  (Resps.' Mem. at 20).

Although the Sixth Amendment to the United States Constitution guarantees "the right to call witnesses in order to present a meaningful defense at a criminal trial," Howard v. Walker, 406 F.3d 114, 131 (2d Cir. 2005) (holding that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense") (quoting Taylor v. Illinois, 484 U.S. at 408; Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001)), this right "may yield to rules and procedure of the adversary process that 'provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.'"  Id. at 131–32 (quoting Taylor v. Illinois, 484 U.S. at 410–11).  Accordingly, trial courts enjoy "wide latitude" and federal courts should be "reluctant to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."  Connelly v. Senkowski, No. 07 CV 4616, 2012 WL 5463915, at *7 (E.D.N.Y. Nov. 8, 2012) (quoting Crane v. Kentucky, 476 U.S. 683, 689 (1986)).  "[W]here an evidentiary ruling was correct pursuant to a state evidentiary rule, a federal habeas court may reverse only if that rule is 'arbitrary or disproportionate to the purposes it is designed to serve.'"  Id. (citing United States v. Scheffer, 523 U.S. 303, 330 (1998); Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006)).

Furthermore, a state court's application of a state evidentiary rule may only be found to be "arbitrary" or "disproportionate" if it "infringed upon a weighty interest of the accused." Id. (quoting United States v. Scheffer, 523 U.S. at 308; Hawkins v. Costello, 460 F.3d at 244, 245).

As discussed supra at 2–3, Section 250.10(2) of New York's Criminal Procedure law provides that a defendant may not present psychiatric evidence at trial unless the defendant serves upon the prosecution and files with the court written notice of her intention to present psychiatric evidence "not more than thirty days after the entry of the plea of not guilty to the indictment." N.Y. Crim. Proc. Law § 250.10(2). Once notice is provided, the prosecution may apply to the court for an order "directing that the defendant submit to an examination by a psychiatrist or licensed psychologist . . . designated by the district attorney." Id. § 250.10(3). The statute specifically provides for preclusion of the defendant's expert testimony if the defendant fails to cooperate: if the court finds that "the defendant has wilfully refused to cooperate fully in the examination ordered pursuant to subdivision three of this section it may preclude introduction of testimony by a psychiatrist or psychologist concerning mental disease or defect of the defendant at trial." Id. § 250.10(5).

"Absent special circumstances, § 250.10's notice requirement has been upheld as a constitutional restriction on the right to present evidence." Singh v. Greene, 2011 WL 2009309, at *18 (citing Almonor v. Keane, 27 F. App'x 10, 12 (2d Cir. 2001); Bien v. Smith, 546 F. Supp. 2d 26, 45–46 (E.D.N.Y. 2008); Rios v. Artuz, No. 07 CV 330, 2007 WL 1958899, at *5–6 (E.D.N.Y. June 29, 2007)). The purpose of the notice requirement is "to allow the prosecution an opportunity to acquire relevant information . . . to counter the defense," to "promote fairness," and to "avoid delay." Singh v. Greene, 2011 WL 2009309, at *18 (quoting People v. Berk, 88 N.Y.2d 257, 264–65, 644 N.Y.S.2d 658, 662, 667 N.E.2d 308, 312 (1996)).

(a) The Record Relied Upon By the Trial Court

In evaluating her sanction claim, petitioner contends that the Court need not adopt the trial court's factual determinations underlying its decision to preclude Dr. Hughes' testimony as a sanction for petitioner's conduct. (Pet.'s Reply at 6–7). Petitioner alleges that, despite "repeated defense entreaties," the trial court declined to review the video recording of the examination held on July 28, 2009. Petitioner argues that since the parties' conduct during petitioner's July 28, 2009 examination was "central" to the trial court's findings of fact, the best evidence of that conduct was the video recording of the examination. (Id. at 7). Petitioner claims that "[t]he iniquity of [the court's] refusal can be seen" in respondents' allegation that petitioner's counsel's "obstreperous conduct . . . required that the exam be suspended in the middle." (Id. (quoting Resps.' Mem. at 21)). To the contrary, petitioner claims that the recording demonstrates that counsel "is shown actively encouraging Petitioner to continue with the examination and to trust in the examiner's ability to alleviate the physical distress Petitioner was experiencing." (Id. (citing Pet., Exs. N, Q)). According to petitioner, she declined to terminate the examination early that day, and the examination ended after 4:00 p.m. (Id. (citing Pet, Ex. N)). Petitioner maintains that "[t]his example typifies the misrepresentations in the prosecution's version of events as revealed by the recording." (Id. (citing Pet., Exs. N, P, Q, R, S)). Accordingly, petitioner argues that because the trial court failed to review the video recording of petitioner's July 28, 2009 examination, its findings of fact should not be presumed to be correct. (Id.)

Respondents claim that the trial court's findings that petitioner engaged in a "deliberate strategy of delay" by violating court orders, failing to appear for an examination by the prosecution's expert, and engaging in conduct reflecting "a pattern of purposeful delay" have not been rebutted by clear and convincing evidence. (Resps.' Mem. at 19 (citing Pet., Ex. A)).

Respondents maintain that, on direct appeal, petitioner "conceded the finding of willful misconduct and limited her claim to whether the sanction imposed was appropriate."  (Id. (citing Pet., Ex. ZZ at 50 (explaining that petitioner "recognize[d] that the court's finding of defense counsel's misconduct fully warranted the imposition of sanctions," but argued instead that "it was disproportionate to preclude a critical defense expert more than two years before trial"))).  Respondents also aver that in her initial papers supporting her petition, petitioner "concedes that her misconduct was willful."  (Id. at 19–20 (citing Pet.'s Mem. at 24 (arguing that while "[t]he defense has accepted from the outset that defense counsel made an error in judgment in advising petitioner not to attend the examination," the sanction of preclusion was disproportionate))).  Thus, respondents contend that the Court should accept the trial court's factual findings as true for purposes of evaluating petitioner's preclusion claim.  (Id. at 20).

Petitioner replies that although she "has acknowledged fault for not resuming her psychiatric examination in September 2009" and accepts that a sanction was warranted, she has not conceded that her conduct was willful.  (Pet.'s Reply at 6).  She further contends that the trial court's factual findings were based on an inadequate record, such that the trial court's factfinding process "disentitles its ultimate findings to the presumption of correctness."  (Id. at 6–7).[23] Petitioner claims that "the Second Circuit has held that . . . deference is only required 'after a full and fair hearing at which the material facts were adequately developed.'"  (Id. at 6 (quoting Oyague v. Artuz, 393 F.3d 99, 104 (2d Cir. 2004)).  She also argues that "[f]ailure to consider key aspects of the record is . . . a defect in the fact-finding process."  (Id. at 6–7 (citing Miller-El v. Cockrell,

---

[23]The Court notes that this argument, focused on the alleged "inadequate record," was not raised in petitioner's original papers in support of her petition; "[t]he law in this Circuit is clear that arguments raised for the first time in reply briefs need not be considered."  Mayer v. Neurological Surgery, P.C., No. 15 CV 864, 2016 WL 347329, at *4 (E.D.N.Y. Jan. 28, 2016) (citing cases).

537 U.S. 322 (2003))).

"[A] state court's determination of a factual issue is presumed to be correct, and is unreasonable only where the petitioner meets the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006) (quoting 28 U.S.C. § 2254(e)(1)).  However, where AEDPA deference does not apply, "mixed findings of fact and conclusions of law" are subject to de novo review.  Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009) (citing Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006)).

As an initial matter, even accepting as true that the video recording of petitioner's July 28, 2009 medical examination is the "best evidence" of what occurred during the examination, the Court finds that the trial court's decision was based on an adequate record.  The trial court explained that "[t]he Court's law secretary was present during a portion of the interview and observed defense counsel interrupt the interview, demand that the psychologist ask defendant certain questions, prompt a recess in the interview, and yell at and argue with the assistant district attorneys and herself, all of which incited an emotional breakdown from defendant."  (Pet., Ex. A at 3).  Moreover, the trial court conducted a hearing at which petitioner's counsel was permitted to present petitioner's position regarding what occurred on July 28, 2009 and also considered papers filed in support of her argument.  (See Pet., Exs. N, FF).  Accordingly, the Court finds that the trial court's factual findings were made after a full and fair consideration of the issues, based on both the law secretary's own observations as well as the parties' own statements.  Thus, the Court respectfully recommends that the trial court's factual findings, described supra at 6, be accepted.

To the extent that petitioner now claims that she has not conceded that her misconduct was "willful" (Pet.'s Reply at 6), petitioner waived that argument by failing to challenge the trial court's finding on direct appeal.  (See Pet., Ex. ZZ).  Rather, with respect to the trial court's finding that

petitioner failed to cooperate with the July 28, 2009 examination and failed to appear for the September 18, 2009, petitioner "recognize[d] that the court's finding of defense counsel's misconduct fully warranted the imposition of sanctions" but argued, instead, that the sanction imposed was disproportionate to the misconduct involved and that there were alternative remedies that could have adequately addressed the violations. (Id. at 50). Thus, to the extent that petitioner now challenges the trial court's finding of willfulness, that argument was waived, and the Court will not recommend disturbing the trial court's finding that petitioner violated Criminal Procedure Law Section 250.10. See Bossett v. Walker, 41 F.3d at 828. Accordingly, the Court respectfully recommends that the trial court's finding that petitioner's misconduct was willful be accepted.

Thus, where state evidentiary rules were applied correctly, according to the deferential standard that a federal court must apply to habeas cases, the Court "may reverse only if [the sanction imposed] is 'arbitrary or disproportionate to the purposes it is designed to serve.'" Connelly v. Senkowski, 2012 WL 5463915, at *7 (citing United States v. Scheffer, 523 U.S. at 330; Hawkins v. Costello, 460 F.3d at 244); see also Michigan v. Lucas, 500 U.S. at 151.

(b) Whether the Sanction Was Arbitrary

In assessing whether the sanction was arbitrary, petitioner argues that while preclusion may sometimes be a permissible sanction, it should only be used "in extremely limited circumstances." (Pet.'s Mem. at 16). Petitioner seems to contend that the preclusion sanction was arbitrary because the trial court should have considered alternative sanctions, which petitioner maintains that the Supreme Court and Second Circuit have recognized should be "adequate and appropriate in most

55

cases." (Pet.'s Mem. at 24 (citing <u>Pulinario v. Goord</u>, 118 F. App'x 554 (2d Cir. 2004)).[24]

Petitioner first notes that preclusion under Section 250.10 is typically reserved "to cases where the defendant either outright refuses to submit to an examination by the prosecution's psychiatrist or fails to file a timely notice of intent to offer psychiatric evidence." (Pet.'s Mem. at 18). Petitioner argues that "absent such contumacious and prejudicial conduct by a defendant, New York courts . . . will not order preclusion but rather some alternative sanction, particularly where . . . the psychiatric testimony is vital to the defense." (<u>Id.</u> at 5–6 (quoting <u>Pulinario v. Goord</u>, 118 F. App'x at 554)).

Here, however, the trial court found that petitioner <u>did</u> refuse to submit to the September 18, 2009 examination by failing to appear despite being directed to proceed with the continued psychological examination on that date, and despite being notified by the prosecution that it

_____

[24]Petitioner and respondents differ about the applicability of Pulinario v. Goord. Petitioner argues that the Second Circuit in that case "highlighted two strict instructions of the Supreme Court that must be followed by state courts in determining whether preclusion is constitutionally permissible," mandating an analysis about (1) whether the restriction on a criminal defendant's rights to present evidence is arbitrary or disproportionate to the purposes it is designed to serve, and (2) whether there were "alternative sanctions" to preclusion, which should be "adequate and appropriate in most cases" (Pet.'s Mem. at 19) (citing Pulinario v. Goord, 118 F. App'x 554). Respondents contend that petitioner's reliance on Pulinario is "misplaced." (Resps.' Mem. at 23). Respondents argue that the court in that case gave great weight to the "sharp tactics" of the prosecutor, who waited until after the defendant had testified and admitted to the crimes charged before seeking preclusion of the psychiatric testimony, which "effectively 'sand-bagged' the defense." (Id. (citing Pulinario v. Goord, 118 F. App'x at 558)). Instead, respondents claim that the court in Pulinario "explicitly declined" to address the situation involved in this case, explaining that "we need not here decide whether preclusion would have been constitutional in this case if the prosecution had moved for and been granted such relief before Pulinario took the stand." (Id. at 23–24 (quoting Pulinario v. Goord, 118 F. App'x at 558)). Finally, respondents claim that the analysis presented in Pulinario is inconsistent with current habeas caselaw; according to respondents, Pulinario "extended the right to present a defense to psychiatric testimony and mandated a proportionality inquiry not required . . . where willful misconduct is in issue." (Id. at 24). This Court need not decide whether or not <u>Pulinario</u> wrongly extended <u>habeas</u> laws in cases directly on point. However, for the sake of argument, this Court assesses the two <u>Pulinario</u> factors in reference to this case above in discussing whether the restriction was disproportionate, and whether it was arbitrary because alternative sanctions could have been ordered.

intended to proceed.  Not only did the trial court, at the hearing on July 30, 2009, direct the parties to proceed on September 18, 2009, but a day later, on July 31, 2009, the trial court confirmed in writing that "both parties are expected to proceed with defendant's continued psychiatric examination on September 18, 2009.  (Id., Ex. AA at 1).  Finally, not only was petitioner aware of the date of the examination, but even after the prosecution declined to adjourn the examination and responded that it intended to proceed, petitioner made the conscious decision not to appear on September 18, 2009, nor did she ask the trial court for an adjournment.

This Court notes that the trial court's decision to grant sanctions was issued only after petitioner failed to appear at the September 18, 2009 psychiatric examination.  While the trial court acknowledged the history of petitioner's tactics in assessing the appropriateness of the sanction, it was only after the September 18, 2009 failure of petitioner to appear that the trial court actually granted the preclusion sanction.  Thus, the trial court only granted sanctions in the specific circumstance that petitioner concedes Section 250.10 is to be reserved for:  namely, when a defendant "refuses to submit" to a psychological examination.

As to the availability of alternate, adequate sanctions, petitioner claims that she "has accepted from the outset that defense counsel made an error in judgment in advising Petitioner not to attend the examination on September 18, 2009" and acknowledges that, as a result, counsel was required to reimburse the prosecution for fees incurred in connection with the September 18, 2009 examination.  (Id.; see also Pet., Ex. A at 15–16).  Petitioner claims that this monetary sanction was sufficient as a penalty, and argues that "instead of considering the monetary sanction as an alternative to preclusion, the trial court treated preclusion as a sine qua non and then additionally imposed the monetary sanction."  (Pet.'s Mem. at 24).  Accordingly, petitioner contends that the trial court failed to consider whether the monetary sanction alone was sufficient to address

petitioner's violation of Section 250.10.  (Id.)

This Court notes that the purpose of Section 250.10 is to "allow the prosecution an opportunity to acquire relevant information . . . to counter the defense," to "promote fairness," and to "avoid delay." Singh v. Greene, 2011 WL 2009309, at *18 (citation omitted).  Petitioner's and her counsel's conduct on July 28, 2009 and September 18, 2009 deprived the prosecution of the ability to examine petitioner as close to February 18, 2008 as practicable and under the conditions required by Section 250.10.  As the Supreme Court explained in Michigan v. Lucas, "there could be circumstances in which preclusion was justified because a less severe penalty 'would perpetuate rather than limit the prejudice to the State and the harm to the adversary process.'"  50 U.S. at 152 (quoting Taylor v. Illinois, 484 U.S. at 413).  Here, however, where continued delays caused by petitioner's misconduct exacerbated the prejudice imposed on the prosecution by having to further delay the psychiatric examination that the prosecution was entitled to take, the trial court did not err in finding that the monetary sanction alone would be insufficient to address this misconduct.

Accordingly, the Court respectfully recommends a finding that precluding Dr. Hughes' testimony as a sanction for petitioner was not arbitrary, nor were there less severe alternative sanctions that should have been imposed.

### (c)  Whether the Sanction was Disproportionate

In assessing whether the sanction was disproportionate, petitioner asks the Court to engage in a balancing exercise to "account for what the Supreme Court, in Taylor v. Illinois, described as 'the fundamental character of the defendant's right to offer the testimony of witnesses in his favor.'"  (Pet's Mem. at 21) (quoting Taylor v. Illinois, 484 U.S. at 400).  Petitioner argues that this balancing exercise  "begin[s] 'with the most significant factor: how important was the

witness?'" (Id.) (quoting Fendler v. Goldsmith, 728 F.2d 1181 (9th Cir. 1983)).[25] Petitioner argues, similar to the arguments discussed supra at 36–38, that "in this case, without Dr. Hughes's testimony, the jury was unable to properly put itself in petitioner's position, as the law on self-defense in New York instructs." (Id.) Petitioner contends that "for a defendant facing a murder charge, removing such a fundamental part of her justification defense was a devastating blow." (Id.) Petitioner further maintains that, while petitioner was acquitted of the murder charge, with respect to the weapons charge, "had the trial [court] even considered the importance of Dr. Hughes's testimony, it should have realized that it would mean the difference between acquittal and conviction." (Id.)

In terms of the importance of Dr. Hughes's testimony, the Court has already addressed these arguments above supra at 37. Namely, the Court first found that there is "no absolute federal constitutional right to present psychiatric evidence on the question of mens rea." Singh v. Greene, 2011 WL 2009309, at *19 (citing Clark v. Arizona, 548 U.S. at 770–71) (see also Pet.'s Mem. at 16, conceding that "the right to present relevant evidence is not absolute; it 'may, in appropriate cases, bow to accommodate other legitimate interest in the criminal trial process'" (quoting Chambers v. Mississippi, 410 U.S. at 295)). Guided by this principle, the Court found, supra at 37, that, on habeas review, the federal court needs to defer to the state court's interpretation of a state

---

[25]The Court notes that petitioner does not appear to outline the rest of the balancing test described by the court in Fendler. The factors to consider include "the effectiveness of less severe sanctions, the impact of witness preclusion on the evidence at trial and the outcome of the case, the extent to which the prosecution will be surprised or prejudiced by the witness's testimony, and whether the violation of discovery rules was willful or in bad faith." Fendler v. Goldsmith, 728 F.2d at 1186. Nonetheless, the Court has already addressed the effectiveness of less severe sanctions, supra at 57–58, as well as the trial court's finding of "willful" action on the part of the petitioner in failing to appear for the scheduled continuation of petitioner's psychiatric evaluation.

evidentiary rule, unless the interpretation is clearly in violation of constitutional precedent.   This Court then found, <u>supra</u> at 45, that the trial court's preclusion sanction was not clearly in violation of constitutional precedent in this case.

Additionally, petitioner fails to recognize that the trial court did consider the importance of Dr. Hughes' testimony in noting that preclusion is a "drastic remedy," but one which was warranted by petitioner's repeated conduct and willful refusal to appear at her scheduled psychiatric examination.  (Pet., Ex. AA at 10).   At the same time, the trial court lessened the potential impact of precluding Dr. Hughes' impact by still allowing in Dr. Campbell's general testimony about Battered Woman's Syndrome.  While petitioner concedes that this testimony was allowed, petitioner instead argues that because "[Dr. Campbell] was not permitted to offer any opinion as to Petitioner, let alone whether she was a battered woman . . . the trial court was denying the jury the framework it needed to assess Petitioner's perception of danger and the reasonableness of that perception."  (Pet.'s Mem. at 21).  However, this argument ignores the fact that not only did Dr. Campbell testify generally as to the effects of abuse on women, but the jury heard from at least six individuals – including petitioner's own children – about Mr. Sheehan's long history of violence perpetuated against Ms. Sheehan.  (See Pet. Ex. PP at 1242–43; QQ at 1517–18); see also discussion supra at 16.  Therefore, the Court finds that the trial court did not deny the jury the "framework it needed to assess Petitioner's perception of danger and the reasonableness of that perception."

In light of the fact that the constitutional right to present psychiatric evidence on the question of mens rea is "no[t] absolute," the Court respectfully recommends a finding that the trial court's preclusion sanction was not disproportionate.  Singh v. Greene, 2011 WL 2009309, at *19.

(d) <u>The Prejudice Caused by Petitioner's Willful Misconduct</u>

Finally, petitioner claims that the trial court failed to properly consider the lack of prejudice to the prosecution caused by her delay. (Pet.'s Mem. at 22).[26]  Indeed, petitioner contends that the prosecution never advanced a claim of prejudice; the argument only appeared for the first time in the court's preclusion order.  (Id.)  At the time of the order, no trial date had been set and the court did not explain why a temporal delay in the date of the prosecution's examination would be prejudicial.  (Id.)  Petitioner maintains that "New York courts had elsewhere found that the prosecution's need to conduct an examination is not particularly time-sensitive if the mental condition is longstanding."  (Id. (citing <u>People v. Caldwell</u>, No. 366/09, 2010 WL 3960620, at *1 (N.Y. Sup. Ct. Sept. 20, 2010)).

Respondents aver that the trial court's decision to preclude Dr. Hughes' testimony was justified, based on the "protracted history of non-compliance with state procedural requirements, which included petitioner's repeated pattern of delay, failure to abide by the court's orders and warnings, and numerous attempts to impede a prompt psychiatric examination by the state's expert." (Resps.' Mem. at 21) (citing Pet., Ex. A)).  Apart from the delay in filing the notice,

---

[26]Petitioner notes that the trial court explained that one purpose of Section 250.10 is to permit the prosecution to examine a defendant "within close temporal proximity to the offense and to any examination by the defense experts, thereby preventing disadvantage to the prosecution in accord with the legislative goal."  (Id. (quoting Pet., Ex. A at 6–7)).  While the trial court noted that approximately eighteen (18) months had elapsed between the shooting in February 2008 and July 28, 2009, when the prosecution commenced its examination (Pet., Ex. A at 14), petitioner explains that she was not actually arraigned until several months after the shooting on June 4, 2008, and thus, her initial Section 250.10 notice was timely served on June 24, 2008.  This was the first date on which the prosecution could seek to perform its own examination.  (Pet.'s Mem. at 22).  Petitioner explains that the trial court found the original notice insufficient and did not approve it until December 17, 2008, but claims that "[f]rom this time onward, there is no question that the prosecution could have proceeded with its examination of Petitioner, but declined to do so – because it preferred to wait for its expert to have the benefit of the defense expert's examination notes," production of which was delayed by petitioner's unsuccessful motion practice.  (Id.)

petitioner's improper conduct included "counsel's obstreperous conduct at the initial examination, requirement that the exam be suspended in the middle, and petitioner's subsequent willful failure to show up to the rescheduled psychiatric examination without giving the state or the psychologist notice that she would not come." (Id.) Respondents claim that this case is like Taylor, in which the Supreme Court acknowledged "the impact of this kind of conduct on the integrity of the judicial process itself," such that "[r]egardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate." (Id. at 22–23 (quoting Taylor v. Illinois, 484 U.S. at 416, 417)). According to respondents, the prosecution was prejudiced in that the delay in petitioner's examination "significantly imped[ed] the state psychologist's ability to determine petitioner's mental state at the time of the incident – which was key to the issues in this case." (Id.)

The Court concludes that the trial court's finding of prejudice to the prosecution caused by petitioner's delaying tactics, by her counsel's disruptive conduct during the July 28, 2009 examination, and by her failure to appear on September 18, 2009, was not without support. By delaying the prosecution's ability to complete its psychiatric examination of plaintiff by several months, the prosecution's and its expert's ability to understand and to assess petitioner's mental state on February 18, 2008, as well as their ability to respond to Dr. Hughes' proposed testimony, was severely undermined, impeding the purpose of Section 250.10.

In light of the foregoing, the Court respectfully recommends a finding that preclusion of Dr. Hughes' testimony was proportionate to the prejudice suffered by the prosecution as a result of petitioner's misconduct, and was not arbitrary. Therefore, the Court respectfully recommends that the petition for a writ of habeas corpus based on the preclusion sanction be denied.

CONCLUSION

In light of the foregoing, the Court respectfully recommends that the petition for a writ of

habeas corpus be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the

Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure

to file objections within the specified time waives the right to appeal the District Court's order. See

28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onondaga Cty., 517 F.3d 601,

604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties

either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
October 17, 2017

/s/ Cheryl Pollak

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York